**Larry FREELAND, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 88–CF–202.

District of Columbia Court of Appeals.

Argued Sept. 12, 1991.
Decided Sept. 10, 1993.

Elizabeth G. Taylor, Public Defender Service, with whom James Klein, Public Defender Service, was on the brief, for appellant.

Bernadette C. Sargeant, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty. at the time the brief was filed, and John R. Fisher and Thomas C. Black, Asst. U.S. Attys., were on the brief, for appellee.

Before ROGERS, Chief Judge, STEADMAN, Associate Judge, and REILLY, Senior Judge.

ROGERS, Chief Judge:

Appellant Larry Freeland makes three separate, but related claims of trial court error in appealing from his convictions of second-degree murder. D.C.Code §§ 22–2403, –3202 (Repl.1989). He contends that the trial judge erred in excluding evidence that (1) someone else was responsible for the murder of appellant's wife, (2) threats had been made against appellant's family, and (3) appellant had reported his fears to a prosecutor before the murder. The trial judge applied the *Brown/Beale*[1] test in concluding that appellant had not established the requisite nexus to allow admission of evidence that someone else had murdered his wife. But, the judge also ruled that threats made by William Hawthorne and his agents against appellant were relevant to appellant's state of mind in leaving and remaining away from the jurisdiction. Indeed, the trial judge also permitted appellant to testify that he thought Hawthorne's agents had killed his wife, in explaining why he had remained away from the jurisdiction. The judge drew the line, however, on defense efforts to bring to the jury's attention alleged threats against appellant's family and, in order to rebut the government's claim of recent fabrication, the fact that appellant had communicated his fears to the government prior to his wife's murder as shown in a pleading filed by Assistant United States Attorney Leiser in the Eastern District of Virginia in Hawthorne's murder case.

We hold that the trial judge too narrowly interpreted the *Brown/Beale* test and, hence, that the evidentiary line drawn by the trial judge line was based on legal error. We also hold that the judge erred in excluding the Leiser pleading as an admission of a party opponent. We conclude, in light of the prejudice to appellant's ability to present his defense and the emphasis placed by the government on appellant's failure to produce any corroboration of his pre-murder fears, that the errors were not harmless, and accordingly, we reverse.

## I.

The body of appellant's wife, Louise, was discovered by her sister around 10 a.m. on May 13, 1984, after she went to the couple's apartment when Louise had failed to respond to successive telephone calls. The

---

1. *Beale v. United States,* 465 A.2d 796 (D.C. 1983), *cert. denied,* 465 U.S. 1030, 104 S.Ct. 1293, 79 L.Ed.2d 694 (1984); *Brown v. United States,* 409 A.2d 1093 (D.C.1979).

sister, and two other relatives, found the front door of the couple's apartment was unlocked and saw their infant son asleep in his crib; the door to an adjacent bedroom was closed. Inside the bedroom they found Louise's body, lying under a bloody sheet, apparently bludgeoned to death by blows that had crushed her face and skull. The wall beside the bed was covered with blood.

Earlier that morning, neighbors had heard a loud and prolonged argument between appellant and his wife. The building manager had knocked on the couple's door in response to complaints, and she had told appellant, when he opened the door, to keep down the noise; the manager saw Louise inside of the apartment at the time, around 2 a.m. One neighbor also saw appellant leave and return to the couple's apartment, when the argument recommenced. Later, another neighbor saw him leave and return on two occasions around 7 a.m. that morning. Around 8 or 8:30 a.m. the apartment maintenance man saw appellant sitting outside of his apartment building; appellant said he was waiting for a ride to Waldorf, Maryland. Twenty minutes later appellant was gone.

On November 28, 1986, two and one-half years after his wife's murder, appellant was arrested in Atlantic City, New Jersey, for an unrelated offense, and the police discovered that he was wanted as a fugitive.

At trial for second-degree murder, the defense presented docket sheets for the Eastern District of Virginia through testimony of a defense investigator. The investigator read the entries that William Hawthorne was charged with assault with a dangerous weapon and first-degree murder. The investigator also referred to a government motion, filed May 25, 1984, to admit appellant's grand jury testimony at Hawthorne's murder trial, and a show cause order against appellant for failing to appear as a witness in that case.

Appellant testified that he had witnessed Hawthorne, a fellow inmate at the Lorton Reformatory in Lorton, Virginia, stab another inmate to death in a prison dormitory. He also referred to his statements to the FBI, that were admitted into evidence, and testified that Hawthorne had a reputation in Lorton as a "very dangerous guy." Appellant denied killing his wife and testified that he thought "the Hawthorne people had killed" her. After speaking to the FBI, appellant testified, he was approached by another inmate who asked if he was the Larry Freeman who had been speaking to the FBI about Hawthorne's murder case; appellant pretended not to be that person. After he was released from Lorton, appellant testified that he continued to receive threats, being approached by two men on the street. Each time appellant claimed that he had escaped by pretending that they had him mixed up with someone else. Appellant also testified that he and his wife were frightened by the threats and that he had told the Virginia prosecutor about his fears. Then, around midnight on May 13, 1984, when appellant was walking home from the grocery store, two men ran up from behind him, and when his usual dodge did not work, they grabbed him. Appellant pulled away and ran. When he arrived home, he tried to persuade his wife to leave town with him, admitting that they had argued about whether she would leave with him. Appellant explained that he had left his family because his wife would not come with him and that he thought that his wife and son would be safe after he left.

## II.

We first address appellant's contention that the exclusion of evidence that someone other than appellant had killed his wife, on the grounds that the defense had failed to meet the "clearly link" test, was error. As appellant points out, "the [trial] court implicitly recognized [that] the [evidence regarding] Hawthorne ... was inextricably intertwined with the question of appellant's guilt."

 We conclude that in applying the *Brown/Beale* test, the trial judge set too high a standard. The test only requires a defendant to proffer evidence that clearly links another person's conduct to the murder. *See Beale, supra* note 1, 465 A.2d at

803; *Brown, supra* note 1, 409 A.2d at 1097 ("evidence must clearly link that other person to the commission of the crime"). In *Johnson v. United States,* 552 A.2d 513, 516, 518 (D.C.1989), decided after appellant's trial, the court explained that "[t]here is no requirement that the proffered evidence must prove or even raise a strong probability that someone other than the defendant committed the offense. Rather, the evidence need only *tend* to create a reasonable doubt that the defendant committed the offense." *Id.* at 517 (emphasis in original). The *Johnson* decision expounded on the meaning of the "clearly link" requirement of *Brown/ Beale,* which a defendant must meet before evidence that a third person committed the crime for which he is charged will be introduced:

> What we mean by "clearly link," as used first by this court in *Brown* ... is proof of facts or circumstances which tend to indicate some reasonable possibility that a person other than the defendant committed the charged offense.... The proffered evidence may, of course, be either circumstantial or direct, and may include, for example, a third party's actions, motives, opportunity, statements and declarations against penal interest.

*Id.* at 516. Furthermore, a defendant may meet his burden under *Brown/Beale* by proffering evidence that in the aggregate establishes the necessary nexus between the proffered evidence and the crime. *Id.* Thus, no single factor is dispositive.

▋ The defense proffered a combination of facts and circumstances in the instant case that were sufficient, under the *Brown/Beale* test, to warrant admission of the evidence tending to suggest that Hawthorne's agents had murdered appellant's wife. The proffer consisted of evidence that (1) appellant was a government witness in the prosecution of Hawthorne and others; appellant was an eyewitness to Hawthorne's killing of another inmate at

Lorton, and he had testified before the grand jury for the government and was scheduled to testify at Hawthorne's trial; (2) persons claiming to be Hawthorne's agents had repeatedly made threats to appellant and his family in order to intimidate appellant and to retaliate for his grand jury testimony in a context that could reasonably be interpreted as related to Hawthorne's concern about appellant's testimony against him in *his* murder trial; (3) appellant had made statements, before his wife's murder, to law enforcement officials expressing his fears that Hawthorne and his agents would retaliate against appellant and his family; and (4) Hawthorne had a reputation and had committed prior acts of intimidation and retaliation against potential witnesses. Based on this proffer the defense argued that appellant had shown that his testimony for the government in Hawthorne's murder case was the reason that appellant and his family were being threatened and that there was a reasonable possibility that someone else had killed appellant's wife in order to silence appellant.

Given this proffer, the fact that the defense did not also proffer that it could produce direct evidence placing Hawthorne or his agents at appellant's home at the relevant time is not dispositive.[2] The defense proffer that retaliatory and preemptive threats had been made by Hawthorne's agents sufficed to show that there was a present ability to carry out the threats through others. Appellant even had evidence that Hawthorne was being prosecuted for threatening witnesses. *See United States v. Hawthorne,* No. F–6979–81. As *Johnson, supra,* 552 A.2d at 516, makes clear, for purposes of admissibility, the focus is properly on the reasonable possibility that someone else might have committed the crime for which the defendant stands charged and not on whether the defendant can produce proof beyond a reasonable doubt that a third person is guilty. *See also Stack v. United States,* 519 A.2d 147,

---

**2.** Appellant testified that within twenty-four hours of the murder of his wife, he was threatened by two men as he was on his way to a store near his home. This incident afforded the two men with an opportunity to find out where

appellant lived. The dissent dismisses this possibility without explanation. *See infra* dissenting opinion at 1201–1202. Yet, appellant testified that the two men told him that they knew where he lived.

153–54 (D.C.1986). The same analysis would apply to the absence of a proffer of direct evidence that Hawthorne knew prior to the murder of appellant's wife that appellant was planning to testify against him; Hawthorne knew that appellant was an eyewitness to the murder even if he was unaware (as he might have been, suggested defense counsel, through the prison grapevine) that appellant had already testified against him before the grand jury.[3]

While a proffer of motive alone may not suffice in meeting the *Brown/Beale* burden, *see Beale, supra* note 1, 465 A.2d at 803, appellant's proffer contained much more. The probative value of the proffer was strengthened by the circumstantial nature of the government's evidence of appellant's guilt, in contrast to *Beale, supra* note 1, 465 A.2d at 799, where three eyewitnesses testified that the defendant had shot the victim.[4] Under these circumstances, the exclusion of the evidence about a third person as the likely killer of appellant's wife was error.

### III.

■ Regarding appellant's contention that it was also error to exclude evidence of threats to appellant's wife as inadmissible hearsay, the record shows that the defense made a proffer regarding threats against appellant's family in a pretrial motion in limine, during opening argument to the jury, and in bench conferences with the trial judge.[5] While, in some respects, the proffer might have been clearer, the trial judge was quite clear that he would not allow evidence to be admitted that referred to threats to appellant's family. Consequently, the evidence was not offered at trial because the trial judge repeatedly ruled that such evidence could not be presented.[6]

The evidence that threats had been made to appellant's family was admissible because it was offered for a non-hearsay purpose. Here, Hawthorne's confederates' statements that they would harm appellant and his family if appellant testified for the government at Hawthorne's trial were not offered for their truth, *i.e.*, that they really would kill appellant if he testified. Rather, they were offered solely for the purpose of demonstrating the impact that they had on appellant. *See Goldsberry v. United States*, 598 A.2d 376, 380 (D.C.1991); *Allen v. United States*, 579 A.2d 225, 228–29 (D.C.1990); *In re C.D.*, 437 A.2d 171, 175 (D.C.1981). As argued in appellant's pretrial motion, the evidence was relevant to explain the reasons for appellant's flight the same day that his wife's body was

---

**3.** Defense counsel proffered that one of Hawthorne's agents had told appellant that he was going to kill appellant and his family if appellant testified at Hawthorne' trial.

**4.** The government's case against appellant was circumstantial, and neither overwhelming nor compelling. Appellant's telephone call the day after his wife's murder and his letter were at least ambiguous. The testimonies of a neighbor and the building manager were not inconsistent with appellant's testimony that he and his wife were arguing about whether she would leave town with him. The most incriminating evidence was that after a noisy argument with his wife, appellant had remained in their apartment for most of the period when his wife was likely killed; despite the fact that a witness was in the stairwell, no one else was seen on the stairs leading to the apartment between 1:30 a.m. and 5 a.m.

**5.** For example, during the trial the prosecutor expressed concern during appellant's testimony that he was going to testify that one of the threats was a threat to kill him and his family. Defense counsel responded that appellant was not going to respond to the question by referring to:

> anything about his family *at this point.* * * * There is a later point—a later threat when [appellant's] family is included in the threat and our position is * * * that [appellant] will indicate in his later testimony, the relevance to explaining his fear that both he and his family were threatened and his subsequent flight. [Emphasis added]

Also at a pretrial hearing, defense counsel proffered that the Virginia pleading stated that "Mr. Freeland had expressed to members of the United States Attorney's office who are government agents ... that he was in fear of Mr. Hawthorne harming him or his people meaning his family." In our view the dissent has misconstrued the record. *See infra* dissenting opinion at 1204.

**6.** The trial judge was concerned that the defense sought to admit the Leiser pleading for its truth, namely to show that appellant had reported his fears to others before his wife's murder.

discovered. In an effort to counter the government's implication that he had fled because he killed his wife, appellant sought to introduce the challenged evidence so he could argue to the jury that the threats had prompted him to leave town. On this record, we are unable to conclude that no reasonable juror could find that appellant had left town in response to these threats—either out of concern for his own safety or because he believed that his leaving would lessen the possibility of danger to his family.

## IV.

■ In connection with appellant's contention that further error occurred in the exclusion of the Leiser pleading from the defense case as an admission by the government, the record shows that the defense called a witness who provided a foundation for the admission of pleadings from the United States' prosecution of Hawthorne in the Eastern District of Virginia and moved for the admission of the Leiser pleading at the close of the defense case.

Lawrence J. Leiser, Assistant United States Attorney for the Eastern District of Virginia, where the District government's correctional facility (the Lorton Reformatory) is located, signed and filed a motion to permit the United States to read appellant's grand jury testimony to the jury at Hawthorne's murder trial on the ground that appellant was unavailable to testify. A memorandum in support of the motion, also filed and signed by Assistant United States Attorney Leiser, stated that "[s]ince [appellant's] grand jury appearance [appellant] has met with the government in preparation for his testimony [at Hawthorne's trial], at which time he indicated a reluctance to testify due to possible retaliation by the defendants [Hawthorne and others] on his 'people.' " [7] Assistant United States Attorney Leiser further stated in the memorandum that "the government believes" that appellant's statements of January 21 and February 23, 1983, to the FBI and his grand jury testimony, in conjunction with corroboration by other witnesses, "more than suffices to assure circumstantial guarantees of truthworthiness." The Leiser memorandum stated that appellant "was served approximately two weeks ago. After [appellant] was served, [his wife] was found dead in her residence."

In rejecting defense counsel's argument that the Leiser pleading constituted an admission by a party opponent, the trial judge ruled that the United States Attorneys' Offices in Virginia and the District of Columbia could not be considered one party in interest for purposes of the rule on admissions. The judge was also unpersuaded that the pleading constituted an admission that would corroborate appellant's claim that he had complained of threats from Hawthorne's agents before fleeing. The judge subsequently acknowledged that the document might be admissible with regard to appellant's perception of his own state of mind, but concluded that the state of mind exception was not broad enough insofar as appellant was, in the judge's view, only fleeing out of fear for his own safety. In its brief on appeal and at oral argument the government argued, as it had in the trial court, that the Leiser pleading was not an admission or made by a party opponent.

■ Appellant contends that the Leiser pleading was properly admissible as a statement of a party opponent to establish that appellant "had expressed fear of retaliation by Hawthorne long before he had any reason to make up that fear to use at his murder trial." In contrast to the cases relied on by the government, appellant maintains that there was no doubt about the meaning of Assistant United States Attorney Leiser's statements in the pleading that he signed and filed in the federal court in Virginia, and hence, no unfairness in holding the United States to the statement of its agent. The government acknowledges in its brief on appeal that the Leiser pleading "contains ... a recitation of appellant's stated belief." Thus, the

7. At a pretrial hearing in the instant case, defense counsel proffered that by "people" appellant was referring to "his family."

Leiser pleading would have corroborated appellant's testimony that before his wife's murder he had complained to law enforcement officials about his fear of Hawthorne. It also would have countered the government's suggestion of recent fabrication by appellant during the prosecutor's extensive cross-examination of appellant in an effort to show that he had never told anyone about the threats until he testified at his trial for murdering his wife. For similar reasons it would have removed any basis on which the prosecutor could argue in his rebuttal closing argument to the jury that there was no corroboration of the threats.[8]

■ The Leiser pleading contains two levels of hearsay: (1) appellant's report of his fears to Mr. Leiser, and (2) Mr. Leiser's memorandum pleading. The first level of hearsay presents no obstacle to admission of the Leiser pleading because appellant's report of his concern is admissible under the state of mind exception to the hearsay rule. *See Nelson v. United States*, 601 A.2d 582, 596 (D.C.1991) ("[t]he law is clear that when a declarant's state of mind is at issue, extrajudicial statements which reveal that state of mind are admissible"); *Clark v. United States*, 412 A.2d 21, 25–26 (D.C. 1980); *cf. Hairston v. United States*, 500 A.2d 994, 997 (D.C.1985) (self-defense); *Rink v. United States*, 388 A.2d 52, 57 (D.C.1978) (same). For the reasons that follow, the second level of hearsay also does not present an obstacle to admission of the Leiser pleading.

In *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), the United States Supreme Court made clear that within a single United States Attorney's Office "[a] promise made by one attorney must be attributed, for [*Brady v.*

*Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) ] purposes, to the Government." *Id.*, 405 U.S. at 154, 92 S.Ct. at 766 (citing RESTATEMENT (SECOND) OF AGENCY § 272 (1986); AMERICAN BAR ASSOCIATION, PROJECT ON STANDARDS FOR CRIMINAL JUSTICE, DISCOVERY AND PROCEDURE BEFORE TRIAL § 2.1(d)). The Court further observed that "[t]o the extent this places a burden on the large prosecution offices, procedures and regulations can be established to carry that burden and to insure communication of all relevant information on each case to every lawyer who deals with it." *Id.* Taking the point a step further, then Judge Stevens (now Justice Stevens) dissenting in *United States v. Powers*, 467 F.2d 1089, 1097–98 & n. 1 (7th Cir.1972) (Stevens, J., dissenting), *cert. denied*, 410 U.S. 983, 93 S.Ct. 1499, 36 L.Ed.2d 178 (1973), viewed "[t]he United States, like other inanimate persons," as bound by the position taken in a formal prosecution and concluded that it cannot escape a view taken in a separate prosecution on the ground that one prosecution simply represents the views of its agents who participate in that particular prosecution. This position is reflected in decisions of several federal circuit courts of appeals. *See United States v. Kattar*, 840 F.2d 118, 130 (1st Cir.1988) (entire Justice Department to be deemed a party opponent in criminal cases) (citations omitted); *United States v. Morgan*, 189 U.S.App.D.C. 155, 160, 581 F.2d 933, 938 (1978) ("where ... the government has indicated in a sworn affidavit to a judicial officer that it believes particular statements are trustworthy, it may not sustain an objection to the subsequent introduction of those statements on grounds that they are hearsay"); *see also Powers, supra,* 467 F.2d at 1094 (because the prior government statement was not

---

**8.** In view of the prosecutor's knowledge of the Leiser pleading, to the extent that the prosecutor's cross-examination suggested that appellant had not told the prosecutor in Virginia about his fears, the cross-examination was improper. *See Berger v. United States*, 295 U.S. 78, 84, 88, 55 S.Ct. 629, 631, 633, 79 L.Ed. 1314 (1935). *See also* AMERICAN BAR ASSOCIATION, STANDARDS FOR CRIMINAL JUSTICE, 3–5.7 (2nd ed. 1980) ("unprofessional conduct for a prosecutor to ask a question which implies the existence of a factual predicate for which a good faith belief is lacking");

NATIONAL PROSECUTION STANDARDS § 77.2, at 211 (2nd ed. 1991) ("[c]ounsel should not ask a question which implies the existence of a factual predicate which he [or she] knows to be untrue or has no reasonable objective basis for believing is true"). *Cf. Hawthorne v. United States*, 504 A.2d 580, 589 (D.C.1986) ("prosecutor may not knowingly present false evidence or permit evidence, known to be false, to go uncorrected"). The closing argument making the same point—that appellant had not told the Virginia prosecutor of his fears—was likewise error.

necessarily inconsistent with the one asserted in the later case and the record did not clearly present the issue, the prior position was inadmissible against the government).

Appellant correctly points out that the cases do not suggest that the party opponent rule is or should be limited to prosecutions within one office of the United States Attorney. *See Kattar, supra,* 840 F.2d at 130 (two United States Attorneys offices involved in two separate prosecutions); *Morgan, supra,* 189 U.S.App.D.C. at 159 n. 10, 581 F.2d at 937 n. 10 ("[w]e note that the Federal Rules [of Evidence] clearly contemplate that the federal government is a party-opponent of the defendant in criminal cases.... [W]hen the government authorizes its agent to present his sworn assurances to a judicial officer ... the statements ... in the [police] officer's affidavit represent the position of the government itself, not merely the views of its agent"). Regarding judicial admissions, the United States Court of Appeals for the District of Columbia Circuit has distinguished, under FED.R.EVID. 801(d)(2)(B),[9] between out-of-court statements by an informant to an agent of the government and a sworn pleading filed by the government in court. *Morgan, supra,* 189 U.S.App.D.C. at 159, 581 F.2d at 937 (sworn affidavit to U.S. Magistrate). Concluding that because there was a sworn affidavit to a judicial officer that the government believed the particular statements of the informant to a detective to be trustworthy, the court held that the government could not object to the admission of the sworn statement on hearsay grounds and, therefore, it was a party admission admissible against the government. *Id.* at 160, 581 F.2d at 938. The court concluded that the trial court had abused its discretion on relevance grounds as well "since it plainly appears that the excluded evidence bears on a matter that could be determinative of guilt or innocence." *Id.* at 158, 581 F.2d at 936.

Although no case is directly on point, the prosecutorial situation in the District of Columbia is unique. For purposes relevant to this appeal, the local prosecutor is the United States Attorney for the District of Columbia. Hence, appellant's murder prosecution in the District of Columbia was brought by the same sovereign which was prosecuting Hawthorne in the Eastern District of Virginia for murder while he was detained in the District of Columbia's correctional facility in Lorton, Virginia. The Leiser pleading was filed in court by a federal prosecutor who spoke for the same Justice Department that was prosecuting appellant. To the extent that a singleness of prosecutorial purpose may be relevant, as the trial judge concluded, it is present here. *See Giglio, supra,* 405 U.S. at 154, 92 S.Ct. at 766; *Kattar, supra,* 840 F.2d at 127 (Justice Department's various offices treated as an entity "the left hand of which is presumed to know what the right hand is doing"); *United States v. AT & T,* 498 F.Supp. 353, 357–58 (D.D.C.1980) (Greene, Harold H., J.) (statements by executive agencies binding as party admissions on the Justice Department; government party admissions not limited to those made by the Justice Department); *Powers, supra,* 467 F.2d at 1097–98 (Stevens, J., dissenting). The geographical happenstance that the District of Columbia's prison facility is located in Virginia, where Hawthorne was charged with killing an inmate, cannot offer a rational basis for exclusion on the ground that the statement was not made by the same party opponent. The Justice Department is prosecuting two men for murder, although through different United States Attorneys' offices.

Appellant did not seek to introduce a pleading in which the government was vouching for the soundness of his beliefs that Hawthorne and his agents would retaliate if appellant testified at Hawthorne's trial. Appellant sought admission of the Leiser pleading to show that he had expressed his fears to law enforcement offi-

---

9. FED.R.EVID. 801(d)(2)(B), provides, in relevant part:

 (2) **Admission by Party–Opponent.** The statement is offered against a party and is ...

(D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship.

cials before his wife was murdered. The Leiser pleading was a representation by the United States to the United States District Court for the Eastern District of Virginia that appellant had expressed such fears to the government prior to the murder of his wife.[10] This is distinct from a suggestion that the government had endorsed the legitimacy of those fears or that any threats had in fact occurred.[11]

Consequently, this case does not present the issues that might arise where different sovereigns are involved or the government is vouching for the credibility or accuracy of the witness' report.[12] Given the interrelationship of appellant and his defense in the instant case with the proceedings against Hawthorne in the Eastern District of Virginia Court, the *Morgan* analysis, by parity of reasoning, is persuasive here. Although there is not a sworn pleading, neither is introduction of the pleading sought to demonstrate the views of the United States. Hence, its exclusion as an admission of a party opponent was error.

## V.

■ The question remains whether appellant was substantially prejudiced by the exclusion of three kinds of related defense evidence—that someone else associated with Hawthorne might have murdered appellant's wife, that there had been threats by Hawthorne's agents against appellant's family, and that appellant had made a pre-murder report of his fear of Hawthorne to the United States government. *See Giles v. United States*, 432 A.2d 739, 746 (D.C. 1981) (substantial prejudice standard).

Appellant's defense was based on the assertion that he had fled out of fear for his life and the safety of his family in connection with testimony he had given and was scheduled to give at Hawthorne's murder trial. Without evidence to show that Hawthorne's agents had specifically made threats to harm appellant and his family because of appellant's cooperation with the government in Hawthorne's murder prosecution, appellant was effectively precluded from rebutting negative inferences from his argument with his wife in the early morning hours before her body was found and his flight. He was also precluded from showing that others had reason and opportunity, not to mention a past history of murder and of threatening witnesses, to

**10.** *Cf.* Fed.R.Civ.P. 11 ("Every pleading, motion ... shall be signed by at least one attorney of record.... * * * The signature of an attorney ... constitutes a certificate by the signer that the signer has read the pleading, motion....; that to the best of the signer's knowledge, information and belief formed after reasonable inquiry it is well grounded in fact...."); Super.Ct.Civ.R. 11 (same).

**11.** The trial judge observed, however, and the prosecutor concurred, that the court had been told that Assistant United States Attorney Leiser had testified. Guarantee of trustworthiness is not an aspect of the admissibility of a statement of a party opponent. *See* 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Evidence ¶ 801(d)(2)[01], at 801–232 (1992) (citing McCormick on Evidence, § 239, at 503 (1954)). Where an admission is involved, the presence of the party is irrelevant. *See* 2 McCormick on Evidence, § 254, at 139–43 (John W. Strong ed., 4th ed. 1992). Contrary to the trial judge's view, there is no unavailability requirement for the state of mind exception to the hearsay rule. *See id.* § 253, at 130 & n. 5. The theory underlying the lack of an unavailability requirement for some hearsay.exceptions is that "the out-of-court statement is at least as reliable as would be [the

declarant's] testimony in person, so that producing him would involve pointless delay and inconvenience." *Id.*, § 253, at 130. Although in assessing harmfulness the dissenting opinion views as "crucial" that defense counsel could have called Mr. Leiser as a witness in the defense case, *see infra* dissenting opinion at 38, the suggestion that Mr. Leiser's availability as a defense witness has bearing on this issue is raised *sua sponte* by our dissenting colleague; no such argument was made by the government and, indeed, the record does not indicate Mr. Leiser's availability as a witness when the defense began its case. It is unnecessary to address the many reasons—tactical and otherwise—why the defense could not want to call the prosecutor as its own witness.

**12.** Moreover, in view of the extensive cross-examination of appellant about the absence of corroboration of the threats, had the cross-examination been proper, *see supra* note 8, the Leiser pleading would have been admissible as a prior consistent statement made when appellant had no motive to fabricate. *See Mitchell v. United States*, 609 A.2d 1099, 1110 n. 20 (D.C. 1992); *Yelverton v. United States*, 606 A.2d 181, 184 (D.C.1992); *Rease v. United States*, 403 A.2d 322, 328 n. 7 (D.C.1979).

murder his wife at the time that she was murdered. Obviously, the prejudice to appellant from the exclusion of such evidence was substantial since it went to the heart of his defense. Contrary to the government's suggestion, the prejudice was not mitigated by evidence that appellant was a government witness and had once failed to appear in court, evidence that Hawthorne had a bad reputation, or presentation of appellant's belief about who had killed his wife and his explanation for fleeing. Absent from the jury's consideration was the fact that Hawthorne's agents had threatened to do, and were in a position to do at the relevant time, what appellant was on trial for—the murder of his wife. The prejudice was exacerbated by the exclusion of the Leiser affidavit, which offered critical corroboration for appellant's claim that his fear of Hawthorne predated his wife's murder and was not a defense that he had concocted afterwards.

The government maintains that any error in excluding the Leiser pleading was harmless in light of appellant's admission that the only value of the pleading was to show his state of mind in fleeing and to corroborate his testimony that he had informed Mr. Leiser of his fears. To the extent this accurately reflects appellant's position, the argument contradicts the manner in which the government tried the case. The prosecutor's cross-examination of appellant repeatedly emphasized the lack of corroboration of appellant's fears of Hawthorne. In closing argument to the jury the prosecutor pointed out that appellant had not told the FBI agents who took his statement about his fears, nor the prosecutor in Virginia, nor the grand jury or police or anybody, and thereby ridiculed appellant's defense.[13]

The Leiser pleading was almost unparalleled in its evidentiary value to appellant because it was the only independent evidence to show that appellant had complained about the threats from Hawthorne before appellant's wife was murdered. By virtue of being a statement by the United States prosecutor, it would have lent considerable credence to appellant's testimony that he had received threats and was fearful. Without the Leiser pleading, as appellant points out, he had only his own word that he had reported his fears of Hawthorne before he needed that fear as a defense in the instant case; the jury could view his testimony as self-serving in nature. It is true that the trial judge's rulings did not prevent appellant from introducing evidence of Hawthorne's indictment for murder, appellant's statements to the FBI and his grand jury testimony, a show cause order for appellant in regard to testifying in Hawthorne's case, and the Virginia prosecutor's motion to use appellant's grand jury testimony in Hawthorne's trial because of appellant's flight (as opposed to Mr. Leiser's memorandum in support of the motion wherein he recounted appellant's report of his fears). But, while the government did not dispute that appellant was a witness at Hawthorne's murder trial, it directed its attack on the plausibility of appellant's reason for fleeing and remaining away, and it implied that his claim of fear was nothing more than a recent fabrication. The excluded evidence offered a direct rebuttal to the government's attack.

The exclusion of the Leiser pleading thereby heightened the prejudice to appellant arising from the exclusion of evidence that appellant's family had been threatened as a result of appellant's involvement with the prosecution of Hawthorne's murder trial and that a third party had threatened to commit the crime with which appellant was charged. *See supra* note 3. Consequently, while appellant was able to present a defense based on evidence that his wife was still alive when he left town and that he fled out of fear arising from threats made to him on Hawthorne's behalf by his agents, the excluded evidence precluded ap-

---

**13.** For example, in closing argument to the jury the prosecutor stated:

Let's talk again about Hawthorne's people and these threats. [Appellant] said down "W" Street he was with his wife and he got a threat. He got a threat from some people about his testifying in [Hawthorne's] case. But, is there any corroboration, ladies and gentlemen, any corroboration about that threat? . . .

pellant from presenting "the heart of [his] defense" based on his claim that Hawthorne's agents had killed his wife. *See Stack, supra*, 519 A.2d at 154.

Accordingly, we reverse the judgment of conviction and remand the case for a new trial.

REILLY, Senior Judge, dissenting:

With all deference to my colleagues, I cannot agree with their conclusion that the challenged rulings of the trial judge amounted to such prejudicial error that appellant's conviction should be reversed and the case remanded for a new trial. It is my opinion that irrespective of whether or not the trial court applied the *Brown/Beale* test too narrowly by ruling out evidence that the supposed agents of Hawthorne (whose threats against appellant were admitted), had also made threats against his family, the correctness of such rulings is purely academic. As I shall point out, the record of the trial reveals that no such evidence even existed, for appellant on the witness stand conceded as much.

With respect to the exclusion of the Leiser pleading, a closer legal issue is presented. But assuming, *arguendo*, that it was error, it was certainly not fatally prejudicial to the defense. Counsel for appellant could easily have remedied the situation by calling the author of the pleading to the stand and if his testimony turned out to be inconsistent, confronted him with this document and thereby secured its introduction into evidence. The defense had already subpoenaed Leiser and the government had agreed to make him available as a witness.

Hence being satisfied that no miscarriage of justice occurred, I respectfully dissent. Although the majority opinion's summary of the record is fairly stated, it does omit some of the details which shaped my thinking. Therefore—at the possible risk of repetition—I include at this point a de-

scription of the crime and the proceedings in the trial court.

## I.

### The Murder and Police Investigation

About 10 o'clock one Sunday morning (May 13, 1984) the sister of Mrs. Louise Freeland, wife of the appellant, decided to drive over to the apartment building—4638 Livingston Road, S.E.—where the couple lived, after becoming concerned when both she and her mother found no one was answering successive telephone calls to the Freeland apartment.[1] Accompanied by two relatives, she found the door of the apartment unlocked, went inside, noticed the infant Freeland son asleep in his crib, and the door to the adjacent bedroom closed. When the trio opened this door, they were horrified at discovering Mrs. Freeland lying under a bloody sheet, apparently bludgeoned to death by blows which had crushed her face and skull. Removing the baby and returning to their car, they headed for a police station. Encountering a squad car on the way, they stopped to tell police what they had seen, and then brought the officers back to the Freeland apartment. After inspecting the scene and arranging for the removal of the body, the police then interviewed several occupants of the apartment building and were informed that appellant and his wife had engaged in a noisy quarrel that had lasted until about 4 o'clock in the morning despite admonitions of the resident manager.[2] Appellant was nowhere to be found, but one person—Rodney Buck, a maintenance man—recalled talking to him on the outside steps between 8:30 and 9:00 that morning. Police detectives continued their investigation the next day, but apparently were unable to find any eyewitnesses to the murder or to pinpoint the time of death. When appellant did not reappear, the United States Attorney's office applied for a bench warrant for his arrest, charging him with

---

1. The residence of the mother and sister was also located in the southeast sector of the city, about a ten-minute drive from the Freeland apartment.

2. A next-door neighbor reported that Mrs. Freeland had accused her husband of being drunk. Another tenant on a lower floor overheard the husband calling his wife a bitch.

the murder of his wife.[3] A warrant was issued by a judge of the Superior Court on the same day, but remained unexecuted as neither the United States Marshal nor the District police could find the suspect.

It was not until two and one half years later that local officials were able to locate appellant. In late November of 1986, they were notified that a man whose name and photograph matched the description on an FBI "Wanted" poster had been arrested on a shoplifting charge by Atlantic City police and was being held in custody in that city.[4] Upon being identified as appellant, he was transported to this jurisdiction, arraigned and, being unable to secure the requisite bond ($50,000), was committed to jail here on December 5, 1986, pending indictment and trial.

## II.

### The Defense Theory of the Case

Assigned as the prisoner's counsel, lawyers for the Public Defender Service then investigated his background. They learned that while serving a term at Lorton Reformatory—the year before his wife's death—appellant saw a fellow inmate, William Hawthorne, stab another prisoner to death in one of the dormitories. When this homicide was investigated, appellant was questioned by an FBI agent. Despite Hawthorne's reputation at Lorton as a very dangerous criminal convicted of a prior murder, appellant agreed to testify against him and subsequently gave the FBI two written statements describing the deadly assault he had witnessed.

Appellant was released from Lorton a few months later. Shortly afterwards, the United States Attorney for the eastern district of Virginia presented the Hawthorne case to a grand jury. This resulted in the return of first-degree murder indictments against Hawthorne and two accomplices. Appellant was a government witness in the grand jury proceedings. Appellant was subsequently interviewed by Assistant United States Attorney Lawrence Leiser in preparation for trial, and was later served with a subpoena requiring him to appear and testify. About a week before the scheduled trial Leiser filed a motion with a memorandum which stated that Freeland was missing and unlikely to appear and, therefore, requested admission of the grand jury transcripts of Freeland's testimony.

The Leiser memorandum explained that Freeland's wife had been murdered, that he had disappeared after her body had been discovered, and that despite efforts of the police and the staff of the United States Marshal's office, no one had been able to find Freeland. The memorandum also stated that since his grand jury appearance Freeland met with the government in preparation for his testimony "at which time he indicated a reluctance to testify due to possible retaliation by the defendants on his 'people'." Defense counsel decided to present evidence that (1) Mrs. Freeland was alive and uninjured when appellant left her, (2) had probably been killed shortly thereafter by agents of Hawthorne, and (3) appellant had become so frightened before departing the city by threats of Haw-

---

**3.** It appears from the affidavit supporting the warrant application that what had precipitated the unsuccessful attempts by mother and sister to reach Mrs. Freeland by telephone was an earlier call the mother had received from appellant. According to the affidavit:

At about 1010 AM. May 13, 1984 the decedent's mother received a phone call from the defendant telling her to come get her daughter. Relatives of the decedent responded to the above address and found the body.

Mrs. Hill, the sister of decedent, was in the same room with her mother when this call was received and testified to the words uttered by her mother during the course of her conversa-

tion with appellant at a pre-trial motions hearing. As the mother had died before the case went to trial, this testimony was ruled inadmissible under the hearsay rule. Thus the jury never learned about the contents of the call or who had placed it, for when Mrs. Hill testified at trial all that she said about it was that the phone had rung and that her mother was "upset" by the conversation with her caller.

**4.** The detective who had made the arrest testified that when appellant was stopped he resisted arrest violently. When finally subdued, it was necessary to carry him into the police station.

thorne's men that he felt it necessary to flee the jurisdiction to preserve his life.

### III.

#### Pretrial Rulings

In order to lay a basis for such defense, counsel filed a motion *in limine* for the admission into evidence of certain documents filed in connection with the trial of Hawthorne for the Lorton murder and his previous trial for a murder committed in the District, including affidavits that Hawthorne had personally threatened two potential prosecution witnesses with death if they testified against him. At a hearing on this motion, the trial judge said he would admit some of the proffered exhibits including the Hawthorne indictment, the statements Freeland had given the FBI, his grand jury testimony, and a show cause order of the federal district court for Freeland's arrest because of his disregard of the subpoena to testify in the Hawthorne murder case. The court ruled that these were admissible to show that appellant had fled the jurisdiction not to avoid prosecution for his wife's murder but to prevent Hawthorne from killing or harming him.

The court, however, told counsel that these documents were admissible only to show appellant's state of mind—not to demonstrate that Hawthorne had been responsible for the wife's murder, commenting on the absence of any evidence that persons connected with Hawthorne were seen in the area of the Freeland apartment the morning Mrs. Freeland's body was discovered. Hawthorne himself was in prison at that time.

Despite defense objection, the court also announced that other proffered documents could not be introduced into evidence, viz., (1) an additional count for obstruction of justice predicted on threats personally made by Hawthorne (while awaiting retrial on an indictment for a murder committed in this city) against two government witnesses in that case,[5] and (2) the memorandum filed by Assistant District Attorney Lawrence Leiser (*supra*) referring to the likelihood of appellant being unavailable as a government witness at the Hawthorne trial. In excluding this pleading, the court held it could not be received as an "admission." My colleagues hold that this exclusion amounted to reversible error.[6]

Not all of the preliminary rulings were unfavorable to the defense. In addition to holding inadmissible the telephone call made by appellant to his mother-in-law on the day of the murder, the court ruled that it would not receive evidence from other tenants of numerous prior quarrels between husband and wife or from members of her family that the Freeland marriage was on the rocks and that she wanted to terminate the marriage relationship. Thus the jury never learned (a) that Freeland had called his wife's mother to tell her to get her daughter less than half an hour before her mangled body was discovered, and (b) that the refusal of Mrs. Freeland to leave town with her husband was not the only source of bitter friction between the couple. The defense had also moved to suppress evidence that police had found a heavy handgun in the room where Mrs. Freeland was found dead. The government objected on the ground that the butt of this weapon was probably the "blunt" object used to break the skull of the victim. Although at first inclined to reject the suppression motion, the court after the government's opening statement excluded the gun because the indictment did not refer to a particular lethal instrument, but to an "un-

---

5. As Hawthorne himself had made these threats, the trial judge deemed any connection between those threats and threats made by persons who were merely thought to be acting at Hawthorne's direction as too "tenuous" to be received as relevant evidence.

6. During a bench colloquy, the trial court was informed that before the Hawthorne trial ended the federal judge denied Leiser's motion to ad-

mit Freeland's grand jury testimony. Since Hawthorne was found guilty of first-degree murder, despite the absence of any current or prior testimony by Freeland, the government must have presented other damaging testimony. As there were four other prisoners, besides appellant and the victim in the Lorton dormitory, when Hawthorne and two accomplices invaded it, Freeland was obviously not the only eyewitness to the subsequent stabbing.

known object"—a description also alluded to by the prosecutor.

## IV.

### *The Trial*

After calling the relatives who had discovered the body, the police officers who arrived, and several occupants of the apartment building to testify as to what they had heard and observed during the early hours of the morning of the murder—limiting this testimony to that period—the government put Gloria Gibson, a sister of appellant, on the stand. From her testimony, the jury learned that appellant had telephoned her the day after the murder. She told him his wife had been killed and that the police were looking for him. About two months later, she received a letter in which her brother described life in Atlantic City, mentioned a young woman with whom he was living, and explained that he was not disclosing his address to her because he did not trust the FBI. At the request of the government, the text of the letter was read from the stand. In the middle of the letter, the author wrote, "I sure wish that what has happened to me didn't happen, but being that it has, I got to deal with it and believe me, I am, to the best of my ability." In closing argument, the prosecutor reminded the jury of this seemingly incriminating admission.[7]

Another government witness, Buck, the maintenance man who was the last person to see appellant before he left the city, testified that he was outside the building washing his car when he noticed Freeland sitting on the steps sometime between 8 and 8:30 a.m. He went over and talked to him, and recalled that Freeland had said he was waiting for a ride to Waldorf. On cross-examination, the witness was impeached with a statement he had given the police, in which he said nothing about a ride to Waldorf but did say that Freeland

had come up to him and another friend of his and suggested that they all go over to a local shop and share a beer. This impeachment was a double edged sword, for Buck's previous statement put the time of this exchange as between 9:30 and 9:45, thus limiting the interval between Freeland's departure and the time the body was discovered to less than three quarters of an hour. Later defense counsel was to suggest to the jury that because Buck had been called upon by Mrs. Freeland to do some maintenance work in her apartment the previous day, he might well have gone back there after he knew Freeland had left the scene and killed her.

When the government rested, defense counsel who had previously indicated that he would probably call four or five witnesses decided to place only two on the stand. The first was a Public Defender intern who proffered as defense exhibits some docket entries and pleadings from the federal proceedings against Hawthorne. One of these was the warrant for Freeland's arrest to show cause for not holding him in contempt for failure to honor the subpoena previously served upon him. This document was admitted.

Freeland was the next witness. He told the jury that at noontime on January 19, 1983, he and five other prisoners were in a certain dormitory in Lorton, when Hawthorne then serving a sentence for murder, entered accompanied by two men, walked past him and over to a prisoner named George Thompson. An argument began. Hawthorne reached into his jumpsuit, pulled out a knife almost two feet in length, and stabbed Thompson in the back. As the latter collapsed on the floor, Hawthorne and his companions left the dormitory, giving Freeland a "real hard" look as they walked out. He and the surviving prisoners placed the victim on a board and carried the body to the infirmary.

---

7. While the majority opinion terms this letter as "at least ambiguous," it was apparently written after the Alexandria trial of Hawthorne had culminated in conviction. As Freeland had absented himself from that trial, he was aware by that time that if he returned to Washington,

Hawthorne and his men had no reason for regarding him as an enemy. Hence whatever credence should have been given for his excuse for staying in Atlantic City after he had learned of his wife's death—fear of Hawthorne if Freeland was jailed—no longer existed.

When FBI agents, assigned to investigate, interviewed him, he told them what he had seen. Freeland identified two statements he had given them describing the incident. He said that after signing the first statement, because of his fear of Hawthorne, he had been transferred to a different facility. Freeland testified that he did not feel safe even after the transfer because he was "approached by a guy who came to me and asked me was I." Before he could complete the sentence, Assistant United States Attorney Bynum voiced, "Objection to hearsay." Counsel were called to the bench, and the following colloquy ensued:

MR. BROWN: Your Honor, if I remember what Mr. Freeland started to say, I believe he was going to testify about a threat that was made against him.

THE COURT: Well, why doesn't this fit into the exception to the hearsay rule where it's not for the truth of the matter asserted, but for the—he stated—

MR. BYNUM: I understand that. It would—it does fit because there's no question the defense in this case was he was scared and that's why he ran. Any statement to that fact about being scared would have to be for the truth of the matter asserted. It could not be for the fact it was merely said.

THE COURT: That's not true.

MR. BYNUM: Well, Your Honor, he's going to say, "He said he was going to kill me and my family if I testify."

THE COURT: That isn't what I'm told. "My family" part is the problem.

MR. BROWN: No, Your Honor, I don't expect that it will be the answer to this question about anything about the family at this point.

THE COURT: I want Mr. Freeland instructed not to say that. Then it's being offered for the truth of the matter asserted?

MR. BROWN: There is a later point— a later threat when Mr. Freeland's family is included in that threat and our position is—I know we discussed it previously, Your Honor—

THE COURT: Yes, we have.

MR. BROWN: Is that as Mr. Freeland will indicate in his later testimony, the relevance to explaining his fear that both he and his family were threatened and his subsequent flight. If the Court wants to instruct and that later statement is admitted for that limited purpose, we have no objection.

THE COURT: I don't think an instruction will cure it. He's crossing that dividing line that I felt I've had to establish here when he starts stating because then that doesn't explain his flight without him [sic] family.

MR. BROWN: Well, Your Honor, he will later say after his wife was killed that one of the reasons—one of the reasons he didn't get back to D.C. is because he would endanger his family by doing so. That's why it's relevant.

THE COURT: No, it isn't. I mean, he can still explain that because I'd be there and there might be danger for them, but I can't allow this rank hearsay when it goes to that assertion. I'll allow it as a threat to him because as I've said, that's not being admitted for the truth of the matter asserted, but rather for his state of mind. But, I don't see the same nexus between assertions about threats against his wife. And, there's no doubt that would be admitted—intended to be offered by the jury in a way I think is impermissible.

MR. BROWN: Your Honor, I think he would say in response to—not this question, to some later question that certainly he was threatened.

THE COURT: This gets us right back to *Beasley*—I'm sorry, *Beasley* is controlling. I have so ruled.

MR. BROWN: Then I would ask an opportunity to instruct Mr. Freeland so he won't—

THE COURT: I'll excuse the jury.

MR. BROWN: I didn't previously because I understood the Court's ruling to be that we were going to be able to talk—

THE COURT: But, competent evidence is in the framework of *Beasley* and—see, we still have nothing on the second prong and that's the problem.

Appellant resumed the stand and testified that the "guy"—a stranger to him but apparently a fellow prisoner—asked him if he was "the Larry Freeland ... that's been talking to FBI agents about the ... murder case that involved William Hawthorne...." According to Freeland, his answer was, "No, ... you must have the wrong guy...."

Freeland's visitor did not pursue the inquiry. Freeland testified that he thought Hawthorne had "somebody out to retaliate against" him, and was permitted to testify over objection that inmates at Lorton viewed Hawthorne's reputation as dangerous. Freeland was released in July and came back to the city to live with his wife and son. He continued to cooperate with the prosecution—the matter having been referred to the United States Attorney's Office for the Eastern District of Virginia located in Alexandria—by testifying before the grand jury which indicted Hawthorne and two accomplices for the Lorton murder.

When asked whether he continued to be afraid of Hawthorne or people working with him, Freeland said he was. He gave as his reason an incident which occurred several miles from his home one afternoon. He and his wife had been visiting a relative and were on their way to a bus stop. Two men accosted him, one of them asking if his name was Larry Freeland. He told them he was. Then he was asked whether he was the guy testifying in the Hawthorne case. He answered in the negative, saying they had me "mixed up with somebody else." He recalled being "shook up ... both guys had their hands in their pocket." While this was his only description of the verbal exchange with the strangers, he elaborated on it in testifying that he reported this incident to the prosecutor, Leiser, and told him that

I had been threatened on the street and the guy on the street had told *me* that I better not—if they find out that I was the guy that—to testify against him [sic] in the Hawthorne case, that they will get back with *me*. They will be definitely checking *me* out. [Emphasis supplied.]

At that time, Freeland said he knew the Hawthorne trial was scheduled for the last week in May, and that he had been served with a subpoena to testify. When his counsel asked him if he received any additional threats, he testified that he had, recalling that on the night before he left town (May 12, 1984) his wife had sent him on an errand to a nearby Safeway to pick up some items for his sick son, and that on his way back, two men ran up behind him and asked if his name was Larry Freeland. When he confirmed this, they inquired if he was the guy testifying against Hawthorne, he answered in the negative, saying they had "the wrong guy." They rejoined, "Oh, no, I don't think we have" and one grabbed him by the arm. Freeland broke away as a traffic light changed and ran across the street, "ran to my house ... from Eastover where I was at the light to my house,[8] and I expressed to my wife what had just happened" telling her:

> Baby, we gonna have to leave town because Hawthorne people are gonna *get me* if I testify against them. [Emphasis supplied.]

Freeland testified that his announcement prompted a "small" argument because his wife, having just gotten a job, did not want to leave a city where her family also lived. He admitted that their disagreement caused them to raise their voices, but after twice receiving warnings to quiet down, they ultimately agreed that Freeland would leave town until the Hawthorne trial was over, and then he would return and stay. Contrary to the testimony of his neighbors, he testified that the quarrel ended sometime between 1:00 a.m. and 1:30 a.m. He also emphatically averred that he had not struck his wife or hurt her in any way.

---

8. Neither counsel asked the witness how far Eastover was from his residence. As there was no testimony that the strangers pursued him

after he had eluded their grasp, the truth of the statement that they knew where Freeland lived is speculative.

When he had packed up and was departing about 7:30 that morning in order to catch a bus destined for Atlantic City, his wife had also risen from bed, he recalled, and was in the living room feeding the baby.

By his own account, it was not until the following day that he learned in the phone conversation with his sister that his wife had been killed. When asked why he did not then return to the city, his answer was:

> I knew at that point that the Hawthorne people had killed my wife and I felt that I'll be killed also before I could get a chance to prove my innocence.[9]

On cross-examination, Freeland was asked about whether he had stated that the two men, who had grabbed his arm the night before his wife was killed, knew where he lived. When he answered in the affirmative, he was asked why after being unable to persuade his wife to leave town he did not take his son with him. He replied that he thought his wife and son would be safe after he left.[10]

## V.

### Discussion

In concluding that the trial judge erred in excluding proffered evidence that someone other than appellant had killed his wife on the grounds that the defense had failed to meet the "clearly link" test, the majority opinion relies heavily on *Johnson v. United States*, 552 A.2d 513, 516–18 (D.C.1989). I cannot agree that even as an abstract matter—the ruling was made *in limine*—this exclusion was wrong. It was not inconsistent with a precedent cited by the trial judge, *Beale v. United States*, 465 A.2d 796 (D.C.1983), *cert. denied*, 465 U.S. 1030, 104 S.Ct. 1293, 79 L.Ed.2d 694 (1984). In *Beale*, we affirmed a trial ruling prohibiting the defense from introducing testimony tending to connect an individual other than the defendant with the commission of a

murder, because even though the proffered testimony showed that certain other persons had as much and perhaps more motive to kill the victim than defendant had, there was no evidence that any of those persons were seen in the area the night of the shooting. In sustaining this ruling, we emphasized, citing *Brown v. United States*, 409 A.2d 1093, 1097 (D.C.1979), that the evidence must clearly link the other person to the commission of the crime. *Beale*, *supra*, 465 A.2d at 803. In the instant case, the trial judge in making a similar ruling, also commented on the absence of any testimony that Hawthorne or his supposed henchmen were seen in the vicinity of the Freeland residence during the short interval between appellant's disappearance and the discovery of the body.

It is true, of course, that in the *Johnson* opinion—handed down as the majority correctly notes after the Freeland trial—the court observed that "[t]here is no requirement that the proffered evidence must prove or even raise a strong probability that someone other than the defendant committed the offense. Rather, the evidence need only *tend to* create a reasonable doubt that the defendant committed the offense." *Johnson*, *supra*, 552 A.2d at 513 (emphasis in original). This decision, we are told, shows that lack of evidence of presence at the scene of a crime is not fatal to the proposed introduction of other evidence. The actual holding in *Johnson*, however, reveals that there must be a linkage between the third person and the crime charged in order to gain admission as creating a reasonable doubt. The challenged ruling, upheld in *Johnson*, excluded evidence that a man who had admittedly been present when the fatal stabbing occurred had engaged in two previous stabbings, a robbery, and several assaults. Thus motive, opportunity, and past acts of violence do not necessarily provide sufficient link-

**9.** No objection was interposed to this answer, nor was any inquiry made about Freeland's reasons for his conclusion.

**10.** In his summation, defense counsel reminded the jury of this particular answer:

> You know, he had reason to think that leaving was *not* something that would expose his wife to danger, because so far as he knew, Hawthorne's people weren't after his family at that point, they were after him. So, it wasn't an unreasonable thing for him to leave his wife and kid there and go.

age. The *Johnson* court distinguished *Stack v. United States*, 519 A.2d 147, 151 (D.C.1986). *Id.*, 552 A.2d at 518. There we did hold that trial error occurred when cross-examination of a government witness designed to elicit admissions of prior assaults by him on the victim was barred as well as testimony from a woman to the effect that she had seen that very witness beat the decedent during the relevant time period. Obviously *Stack* has no bearing here, as no evidence was proffered of testimony that anyone had seen an assault on Mrs. Freeland.

But even assuming the majority is correct in holding these rulings error, I strongly disagree with the majority's view that "the evidence [references of threats to appellant's family] was not offered at trial because the trial judge repeatedly ruled that such evidence could not be presented." The reason it was not offered was no such evidence existed.

What caused the trial judge to rule as he did was that the prosecutor in objecting to a question propounded by the defense counsel while Freeland was on the stand, surmised that opposing counsel was seeking to bring out testimony about threats to the family as well as himself. Defense counsel immediately disclaimed that his question was designed to do this.[11] It was in the course of a bench colloquy, overruling this objection, that counsel was told that he should limit the witness to threats of retaliation against himself.

Counsel then proceeded to examine appellant as to what threats had been made to him. Although the judge's ruling had given appellant carte blanche to describe any threats of retaliation to him, if he took the stand against Hawthorne, he was unable to testify that any of the strangers who had approached him had made any explicit threats of bodily harm to him, let alone his wife and family. It is clear from his own account of the three incidents he regarded as sinister attempts to intimidate, that all he heard were questions as to whether he was the Larry Freeland who was going to testify against Hawthorne.

On the first two occasions, an inquiry put to him by a fellow prisoner and the street encounter while he and his wife were walking to a bus stop, he brusquely dismissed his questioners by saying that they were talking to the "wrong guy." On the third occasion—the night before his wife's death—he gave the same answer to a similar question to the two men who accosted him while he was returning to his apartment. When one of them professed disbelief and grabbed him by the arm, he eluded further conversation by throwing off his grasp and darting across the street. Thus his own actions prevented the people he believed to be agents of Hawthorne from making any explicit threats, if indeed that had been their intent.[12] Had he permitted the questions to continue, it is quite possible that the strangers were prepared to offer him a bribe to stay away from the Hawthorne trial.

Despite the unlikelihood that the intimidating strangers while saying nothing about what they would do to Freeland did utter threats of harm to his wife and child, the majority infers that appellant refrained from describing such utterances to the jury only because of the challenged warning from the bench. But any conjecture that threats of that sort were actually made was dispelled by appellant's own testimony. In explaining to his wife why the family had to leave town, he testified that he told her, "because Hawthorne people are gonna get *me*,"—not "gonna get *us*." Plainly, he

11. *See* Tr. 559–61, reproduced at pp. 28–30, *supra*.

12. We do not deem it unreasonable for appellant—given what he had seen Hawthorne do at Lorton and what he knew of his reputation—to conclude from the first street encounter that Hawthorne's men had tracked him down and that he—and perhaps his "people"—were in serious danger if he testified. This may have been the basis for the fear of retaliation he expressed to the United States Attorney—not any specific threat.

had heard nothing to indicate that she was in peril.

Moreover in response to a question, he told the jury that at the time he fled the city, he had no reason to think that his wife or other members of the family were in any danger from Hawthorne's agents. He could scarcely have said this had he ever heard threats directed against them. As I have noted, his counsel did draw the recollection of the jury to this testimony in his closing arguments.[13]

Thus, my review of the record compels me to conclude that the challenged ruling of the trial judge was not the real reason the defense was unable to present evidence of threats to appellant's family. Such evidence did not exist. Hence, the issue of whether error was committed became academic.

I perceive no prejudicial error fatally impairing appellant's defense by the exclusion of the pleading filed by Prosecutor Leiser in the United States District Court in Alexandria a week before the Hawthorne case was to go to trial. It was originally proffered to show that threats of retaliation to Freeland's "people"—presumably his wife and child—was one of the factors which contributed to appellant's decision to flee to a distant city. The majority makes the point that if this pleading had been admitted it would have effectively rebutted (or perhaps foreclosed) the government's argument to the jury that appellant's testimony about the three attempts to scare him from taking the stand at the Hawthorne trial was a fabrication—something he had thought up after his arrest and extradition. As the majority notes, not only in summation but also in cross-examination, the government was at pains to establish that appellant's account of these incidents was

completely lacking in corroboration, and concludes that this argument could not have been made if the jury knew that appellant, long before he fled, had reported at least one of these incidents to Leiser.

The flaw in this rationale, however, is that the Leiser pleading in itself provides no corroboration that appellant had ever reported to Leiser that either he or his people had been threatened. All that the Leiser memorandum recounted (*see* p. 1197, *supra*) was a reluctance on the part of Freeland to testify "due to possible retaliation by the defendants on his people." It is possible of course that in the interview to which the memorandum referred, Freeland had told Leiser that his fears of retaliation were based upon his two encounters with men who suspected he was a witness against Hawthorne. But it is much more possible, because after talking to Leiser defense counsel elected not to put him on the stand, that the only reason Freeland gave for requesting to be excused as a prospective witness, was that he knew Hawthorne was capable of exacting deadly vengeance upon an enemy.

I concede that the reasons given by the trial judge for excluding the Leiser pleading were probably wrong in view of the authorities cited by the majority for the proposition that anything said by an agent of the Department of Justice in an official document is admissible, even though the statement was made in another case and in a different jurisdiction. Any document prepared in the ordinary course of business may be received as an exception to the hearsay rule.[14]

But what strikes me as crucial is that appellant's able counsel could easily have remedied whatever harm the judge's ruling had caused the defense. Appellant had

**13.** *See supra* note 9.

**14.** By the same standard for admissibility, the police affidavit showing that the deceased mother-in-law had received an ominous telephone call from appellant only about 20 minutes before the body of her daughter was discovered

should not have been excluded. *See* p. 1197, n. 3, *supra*. Now that the case is going back for another trial with an implied instruction to admit the Leiser memorandum, the new trial judge might well reconsider the admissibility of this affidavit.

obtained a subpoena which was served on the declarant, Leiser. The latter responded and was available as a witness when the defense opened its case—his availability having already been pointed out and assured by the government at an earlier bench conference when the Leiser pleading was first discussed. Had Leiser been unable to remember what facts had prompted his pleading, or had disparaged its accuracy, the challenged document could have been introduced either to impeach him or to refresh his memory. Defense counsel decided to rest without calling Leiser to the stand, although he had said in an earlier bench conference that he had already talked to Leiser. Presumably he had ascertained that Leiser's testimony would not have been helpful. Nevertheless, it is plain that it was the defense which elected not to place on the stand the only person who possibly could have corroborated Freeland's testimony that threats of retaliation made him fearful of appearing at the Hawthorne trial.

The majority opinion takes the prosecutor to task for arguing—after successfully objecting to the introduction of the Leiser pleading—that appellant's testimony was not corroborated. In my view, the same reproach could be leveled at the Public Defender's office, for its lack of candor for advancing the argument it did (*see* reply brief, pp. 18–19). As I have pointed out, its trial counsel—by not calling the witness it had subpoenaed—was equally responsible for preventing the jury from seeing the Leiser memorandum.