**Dina A. JAMISON and Lemuel Kenley, Appellants,**

v.

**UNITED STATES, Appellee.**

**Nos. 89–399, 89–488.**

District of Columbia Court of Appeals.

No. 89–399 Argued Dec. 12, 1990.
No. 89–488 Submitted Dec. 12, 1990.
Decided Nov. 27, 1991.

*Wilkins v. United States,* 582 A.2d 939, 942 n. 7 (D.C.1990).

Michael Lasley, Washington, D.C., appointed by this court, for appellant Jamison.

James W. Robertson, Washington, D.C., appointed by this court, was on the brief for appellant Kenley.

Eileen F. Sheehan, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher, Roy W. McLeese III and Kevin Flynn, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before ROGERS, Chief Judge, and FERREN and STEADMAN, Associate Judges.

STEADMAN, Associate Judge:

Appellants Lemuel Kenley and Dina Jamison were occupants[1] of a two-story row house in which quantities of cocaine, with an estimated street value of $3,000, and related drug packaging paraphernalia were

---

1. The home was Jamison's. Kenley, her boyfriend, had a residence elsewhere but kept clothes in the home, spent practically every weekend and several nights a week there, and contributed financially to expenses. Two of

seized pursuant to a search warrant.[2] In a joint jury trial, each was convicted on one count of possession of cocaine with intent to distribute, D.C.Code § 33–541(a)(1) (1988), and one count of possession of drug paraphernalia. *Id.* § 33–603(a).[3]

The principal trial errors asserted on appeal are: 1) the government's introduction into evidence of Jamison's withdrawal of large sums of money from her bank account following her arrest; 2) the impeachment of Jamison with the results of a post-arrest drug test and a refusal to sever as a result of this impeachment; and 3) the refusal to permit the defense to introduce evidence of cocaine possession by a son of Jamison who, although living elsewhere, had free access to the home.[4] Jamison also challenges the imposition of a probationary sentence upon her without her consent. We affirm the convictions but remand for a resentencing of Jamison.

I

Jamison and Kenley were arrested on a Friday, three days after the police raid, and released on their own recognizance. The following Monday, they went to the bank where Jamison had an account and attempted to withdraw all the money she had on deposit. She withdrew $5,000 in cash, and, because the branch had no further cash to spare, obtained a cashier's check for the remaining balance, approximately $8,000. The check was made payable to Kenley's brother, who was with Jamison in the bank. Kenley himself was waiting outside in the car. Jamison took the check to the main office of the branch to cash. When she arrived there, she was met by police officers who seized both the cash and the cashier's check as suspected proceeds of crime.

The bulk of the $13,000 in the account had been deposited there in the week or two preceding the arrest. Jamison asserted that $2,500 of the money was from Kenley (who had no bank account of his own),[5] $7,100 represented the proceeds from the sale of her car, and $3,700 represented cash savings from a credit union account and other sources. She said she intended to use the money upon withdrawal for a new car, payment of an attorney for fees in connection with her house, and dental work, and was withdrawing it because "it was my money, and I felt as though I didn't want them [the police] to have it, because I had things that I had saved it for."[6] She also volunteered that the reason she had obtained the cashier's check in Kenley's brother's name was so that "they can't take my money off me." Subsequently, in response to a question whether the check had been seized by the police when she arrived at the bank's main office, she responded, "Right. And that's what I was trying to avoid. That's the reason I was going to get my money earlier."

All this information with respect to the withdrawal of funds came into evidence through the cross-examination, over defense objection, of Jamison by the government. The government argues that the evidence of Jamison's withdrawal of funds is probative of consciousness of guilt.[7] Us-

---

Jamison's sons, Samuel age 20 and Asa age 6, also lived in the home.

**2.** Also found in the home were a .44 magnum revolver and a number of rounds of ammunition.

**3.** Jamison was acquitted but Kenley convicted of additional counts of possession of an unregistered firearm, D.C.Code § 6–2311(a) (1989), and unlawful possession of ammunition. *Id.* § 6–2361(3).

**4.** We find no plain error in the trial court's failure, *sua sponte*, to give an immediate cautionary instruction to the jury that its recollection controlled when the prosecutor allegedly

misquoted prior testimony in cross-examining Jamison. *Watts v. United States,* 362 A.2d 706, 709 (D.C.1976) (en banc).

**5.** This was not the first such occasion that Jamison had deposited Kenley's money in her account. She testified that the preceding March, she had deposited $2,000 for him.

**6.** She said the police had taken her "bank books" when she was arrested.

**7.** It also argues that the possession of large sums of money is probative of a large-scale drug operation and that the commingling of funds shows the close relationship between the appellants.

ing the same theme with a reverse twist, the appellants argue that this very feature brings it within the stricture of *Drew v. United States*, 118 U.S.App.D.C. 11, 331 F.2d 85 (1964), which in general prohibits the introduction of "bad acts" committed by the defendants except in certain limited circumstances and subject to cautionary instructions. In particular, the appellants object to the questioning of Jamison by the prosecutor as to her awareness of the process of forfeiture of proceeds of narcotics trafficking,[8] which took place following the testimony about the seizure of the check and the cash at the bank's main office.

■ Assuming without deciding that the course of questioning about the bank account withdrawal was properly subject in whole or in part to objection under *Drew*, we do not think that it was so prejudicial in the circumstances here as to mandate reversal. The probative value of the joint involvement of appellants in the account and the withdrawal made from it, including the issue of motivation, was considerable when weighed against possible prejudice. Albeit in cross-examination, it was Jamison herself who first presented the explanation that she had withdrawn the money, at least in part, because "I felt as though I didn't want them [the police] to have it." The prosecutor's inquiry further into this concern as being motivated by knowledge of the drug forfeiture law occupied less than three pages of transcript in the course of lengthy testimony by Jamison. Jamison denied anything more than awareness of the general concept of forfeiture, without knowledge of the procedures and details, and fully expounded to the jury her explanation of why she had withdrawn the funds at that time. At no point in closing argument did the prosecutor allude to the fear of forfeiture; indeed, the government made no mention at all of the post-arrest events with respect to the bank account.[9] Moreover, the evidence against appellants

on the underlying charge was strong. The home was owned and lived in by Jamison with two of her children; Kenley had also resided in the home for some time before the search. See note 1 *supra.* Within this home, located at various places including the kitchen, dining room and appellants' bedroom, the police seized a considerable quantity of drugs, cash, firearms and ammunition, and a wide range of drug packaging equipment and supplies. The only real issue was appellants' denial of any knowledge of these items or their use, as to which both appellants testified and were subject to jury assessment of credibility.

Given all the circumstances, we are unable to conclude that any error in the scope of the permitted cross-examination of Jamison warrants reversal for a new trial.

## II

■ Jamison contends that the trial court erred by allowing the prosecutor to impeach her with questions about her post-arrest drug test which purportedly tested positive for cocaine use. Our decision in *Jones v. United States*, 548 A.2d 35, 39 (D.C.1988) establishes that such questioning was plainly proper. In that case, the appellant had testified that he found the packets of cocaine and was unaware of their contents. Thus, the prosecutor's questions on cross-examination about the appellant's prior cocaine use "comprised legitimate exploration of two issues that appellant himself had raised: his sophistication with respect to drugs and his general credibility." *Id.* Likewise here, Jamison on direct examination had denied any cocaine use and indeed denied having ever seen cocaine. Her defense was innocent presence; *i.e.*, she claimed she was unaware that any drugs were located in her home. The prosecutor's questions bore di-

---

8. *See, e.g.,* D.C.Code § 33–552(a)(6) (Supp.1990), permitting seizure and forfeiture of "[a]ll cash or currency which has been used, or intended for use, in violation of [the drug laws]." *See generally* CRIMINAL PRACTICE INSTITUTE TRIAL MANUAL ch. 16 (1990).

9. The only direct mention of those events was by appellant Kenley, who argued briefly that there was nothing illogical or sinister in such a withdrawal of funds. Appellant Jamison made a tangential reference to money-laundering.

rectly on this direct testimony.[10] Moreover, the prosecutor clearly had a factual predicate for asking the questions; as the trial court noted, the Pretrial Services Agency report indicating current drug use was in the case jacket, available to everyone. The government was not compelled to impeach Jamison only by proof of the tests themselves. *See Sherer v. United States,* 470 A.2d 732, 738 (D.C.1983), *cert. denied,* 469 U.S. 931, 105 S.Ct. 325, 83 L.Ed.2d 262 (1984); *Jones, supra,* 548 A.2d at 39.[11]

■ Following this line of questioning, Kenley moved for severance. He asserts the trial court abused its discretion in denying this motion. "When two or more persons are charged with jointly committing a criminal offense, a strong presumption arises that they will be tried together." *Tillman v. United States,* 519 A.2d 166, 169 (D.C.1986). Hence, this court will reverse a denial of a motion for severance "only upon a clear showing that the broad discretion accorded the trial court in this regard has been abused. To demonstrate that the trial court abused its discretion in denying their severance motions, appellants must show not simply that they were prejudiced but that they suffered 'manifest prejudice' from the joinder of their cases." *Payne v. United States,* 516 A.2d 484, 489 (D.C.1986) (citation omitted).

In substance, Kenley asserts that his and Jamison's defenses were intertwined, and if the jury believed that Jamison used cocaine, his case was irretrievably affected. However, it is not enough that part of the evidence at trial is applicable only to a codefendant or that the evidence against one defendant is more damaging than the evidence against another. *Id.* at 490–92. The impeachment of Jamison was incom-

plete; she denied knowledge of the test result and the government did not present extrinsic evidence of the drug test itself. Nor did the test directly implicate Kenley. Moreover, the drug test impeachment questioning formed only a small part of the substantial evidence against appellants. Unlike the situation in *Hordge v. United States,* 545 A.2d 1249 (D.C.1988), which Kenley cites, the government neither focused upon the impeaching testimony nor used it against Kenley. We find no abuse of discretion in the refusal to sever.

### III

■ Kenley further contends that the trial court erroneously prohibited the introduction of evidence that the cocaine was in the exclusive possession of someone else, namely Gary[12] Marshall, Jamison's son, who lived elsewhere but visited the house regularly. On direct examination of Samuel Marshall, defense counsel asked whether he had seen his older brother Gary in possession of cocaine outside of the house.[13] The government's objection was sustained by the trial court, and defense counsel moved on to the next unrelated question.

As Kenley acknowledges in his brief, this proposed line of questioning sought to present "evidence that someone other than the accused ... committed the crime," which may be presented only when "there are sufficient indicia that the evidence is reliable," *Brown v. United States,* 409 A.2d 1093, 1097 (D.C.1979), and the evidence "must clearly link the other person to the commission of the crime." *Beale v. United States,* 465 A.2d 796, 803 (D.C.1983), *cert. denied,* 465 U.S. 1030, 104 S.Ct. 1293, 79 L.Ed.2d 694 (1984).

10. Appellant also argues that the administration of the drug test violated her sixth amendment right to counsel. This is meritless; the test was administered upon arrest, before the right to counsel attaches. *See McNeil v. Wisconsin,* —— U.S. ——, 111 S.Ct. 2204, 2207, 115 L.Ed.2d 158 (1991); *Schmerber v. California,* 384 U.S. 757, 765, 86 S.Ct. 1826, 1832, 16 L.Ed.2d 908 (1966).

11. The government indicated it wished to present evidence of the tests, but the trial court

ruled that this could be done only through expert opinion with respect to the tests themselves and denied the government the necessary several days to obtain such witnesses.

12. The transcript at times refers to him as Jerry.

13. Samuel, who lived in the house, had just testified that he had never seen anyone inside the house with drugs.

Here, however, Kenley further acknowledges that no proffer or offer of proof was made as to the evidence expected to be elicited from Samuel nor of Gary's involvement in the drug enterprise. *See District of Columbia v. Barriteau*, 399 A.2d 563, 569 (D.C.1979) ("To properly preserve excluded testimony for review on appeal, trial counsel must normally make an offer of proof."). While he asserts that "a question, in the context of the record, may itself so specifically indicate the purport of the expected answer" that an offer of proof is not required (quoting E. CLEARY, McCORMICK ON EVIDENCE § 51 (3d ed.1984)), the deficiency in the record here is plain, if only in the absence even of the temporal context of any supposed observation by Samuel of Gary with drugs, which in any event would have been outside the house at some unknown location. As we recently observed in *Collins v. United States*, 596 A.2d 489 (D.C.1991), "some temporal nexus between the witness's observations and the crime is required." 596 A.2d at 494 (citing *Commonwealth v. Graziano*, 368 Mass. 325, 330, 331 N.E.2d 808, 811 (1975).[14] In these circumstances, the trial court did not abuse its discretion, much less commit plain error, in sustaining the objection.

## IV

■ Jamison's final argument is that the trial court imposed two years probation upon her without her consent in violation of D.C.Code § 16–710(a) (1989).[15] That subsection provides for the suspension of imposition or execution of sentence and authorizes the court in such circumstances to place the defendant on probation. However, it contains the specific proviso that "[a] person may not be put on probation without his consent." [16] In interpreting a statute, we "must first look at the language of the statute by itself to see if the language is plain and admits of no more than one meaning. The words of the statute should be construed according to their ordinary sense and with the meaning commonly attributed to them." *Davis v. United States*, 397 A.2d 951, 956 (D.C.1979) (citation omitted).

Since the language here is clear, the only question is whether Jamison gave her consent or at least did not object to the probation. Here, immediately following the imposition of sentence, Jamison's counsel sought a reduction or elimination of the probation. Finally, this exchange took place:

> MR. LASLEY [JAMISON'S COUNSEL]: I think, I would ask the Court to reconsider.
>
> THE COURT: I've reconsidered it and I am denying reconsideration—I'm denying—
>
> MR. LASLEY: Just give her the 30 days as opposed to putting her on probation.

**14.** While in *Collins,* we remanded the case to the trial court, where the trial court had "left defense counsel very little room to provide the appropriate proffer," 596 A.2d at 494, no similar problem was presented here. Furthermore, the evidence at issue in *Collins* was far more central to the case, involving testimony as to the presence of drugs at the very place of the charged offense.

**15.** Jamison first received a mandatory twenty months to five years sentence on the count of possession of cocaine with intent to distribute, in addition to which a fine of $1,500 was imposed. Then, on the count of possession of drug paraphernalia, the court imposed a sentence of thirty days, on which he immediately suspended execution and placed Jamison on probation for two years, with drug testing and drug treatment. The probation was to begin upon the end of the sentence for the cocaine

conviction. A probationary term may exceed that of the suspended sentence. *See Simmons v. United States,* 461 A.2d 463 (D.C.1983).

**16.** Even absent a statute, "[a] defendant generally may reject probation and elect to have sentence imposed." *United States v. Alexander,* 743 F.2d 472, 479 (7th Cir.1984) (quoting *United States v. Mitsubishi Int'l Corp.,* 677 F.2d 785, 788 (9th Cir.1982)); *see also State v. Carmickle,* 307 Or. 1, 762 P.2d 290 (1988) and authorities cited. As one commentator has stated, probation is "a rehabilitative procedure in which the motivations of the defendant are vital. He [or she] takes an important step toward success when he [or she] fully understands and voluntarily assumes the conditions of his release." S. RUBIN, LAW OF CRIMINAL CORRECTION 214 (2d ed.1973). *See Thompson v. United States,* 444 A.2d 972, 974 (D.C.1982) (recognizing "rehabilitative goals of probation").

THE COURT: I've reconsidered it a second time now in the last two minutes and I'm denying your request and—

MR. LASLEY: The Court is not inclined to give her 30 days as opposed to putting her on probation?

THE COURT: I've reconsidered it now for the third time in two minutes and I'm denying your request.

■ The government argues that defense counsel was simply attempting to negotiate a more lenient sentence for Jamison, and notes that he did not state that Jamison refused to consent. We think this interpretation of the sentencing proceedings is untenable. Where counsel or the defendant fairly manifests an apparent objection to the probation, as plainly was the case here, the trial court cannot proceed to impose probation without obtaining an explicit consent on the record, to ensure compliance with the command of the statute. *See Clayton v. United States*, 429 A.2d 1381 (D.C.1981) (court has no authority to impose sentence of a nature or in manner not authorized by statute).[17]

Accordingly, we remand the case for resentencing of Jamison in accordance with law. In all other respects, the judgments appealed from are affirmed.

*So ordered.*

---

**17.** Reflective of a goal of probation, see note 16 *supra,* an oral exchange may take place at sentencing whereby the trial court reviews the conditions of probation and ascertains the defendant's understanding and agreement to comply. Criminal Form 1 of the Superior Court ("Order Imposing Conditions of Probation") made specific provision for a defendant's signature to a statement that "[t]his probation order has been explained to me and I understand and accept its conditions." Although still appearing in the Appendix to the published rules, 1 D.C. Court Rules 781 (1991), this form has apparently been superseded by a combined form of "Judgment and Commitment/Probation Order," used in this case, containing no such written provision.