Reginald **WINFIELD**, Appellant,

v.

**UNITED STATES**, Appellee.

No. 92–CF–723.

District of Columbia Court of Appeals.

Submitted Dec. 2, 1993.

Decided Dec. 30, 1994.

---

Miriam M. Smolen, Asst. U.S. Atty., with whom J. Ramsey Johnson, U.S. Attorney at the time the brief was filed, and Thomas C. Black, and Silvia L. Gonzalez, Asst. U.S. Attys., Washington, DC, were on the brief, for appellee.

Before WAGNER, Chief Judge,* and SCHWELB and KING, Associate Judges.

Opinion for the court by Chief Judge WAGNER.

Dissenting opinion by Associate Judge SCHWELB at p. 615.

WAGNER, Chief Judge:

Appellant, Reginald Winfield, was convicted following a jury trial of first degree murder while armed (D.C.Code §§ 22–2401, –3202), possession of a firearm during a crime of violence (D.C.Code § 22–3204(b)), and carrying a pistol without a license (D.C.Code § 22–3204(a)).[1] His sole argument on appeal is that the trial court erred in precluding him from introducing evidence that another individual committed the offenses. Finding no abuse of discretion in the trial court's ruling excluding the proffered evidence, we affirm.

## I.

According to the evidence presented by the government, three eyewitnesses to the crime saw appellant chase down and fatally shoot Deborah Davis in Southeast Washington on the night of July 26, 1990. The first, Stephanie Taylor, had known appellant for two years from the neighborhood. She testified that at approximately 10:40 p.m. that night, she saw appellant chasing a woman in the direction of a basketball court in the parking lot at 700 12th Street, S.E. Ms. Taylor heard appellant say, "Do you like snitching, b[ ]?" According to her testimony, one gunshot rang out as appellant chased his victim, and she heard another just before the woman grabbed and fell on Reba Young, a young child who lived in the neighborhood. Ms. Taylor testified that although she did not

Jensen E. Barber, appointed by this court, Washington, DC, for appellant.

* *Judge* WAGNER was an *Associate Judge* of this court at the time of argument. Her status changed to *Chief Judge* on June 14, 1994.

1. Unless otherwise specified, all references to the D.C.Code are to the 1981 edition and supplement.

see appellant's face, she could identify him by his clothing, height, weight, voice, and distinctive walk. She said she had seen him in the same clothing before. Ms. Taylor recounted that later that night she was with a group of people, including Reba Young, when she saw appellant standing in front of 700 12th Street, S.E. At that time, she heard appellant say that "he was tired of every time he do something that little girl be around." She further testified that appellant was wearing the same clothes that he had worn earlier that night, i.e., the dark hood and "dingy sweat material shorts." The next day, Ms. Taylor saw appellant standing over the spot where he had shot Ms. Davis. This time, she heard him say to a group of "boys," "This is where [I] bust the b[ ] at." At trial, Ms. Taylor identified a photograph of appellant in which he was wearing the same clothing that he was wearing at the time of the shooting.

Arnold Young, who was about nine years old at the time of the crime and who lived in the neighborhood, testified that he had known appellant for some time. On the night of the shooting, according to Arnold, he was walking with his cousin, Reba Young, to a carry-out store when he saw appellant chasing and shooting at a woman. He testified that the appellant shot at the woman several times, and the woman grabbed his cousin, Reba, as she fell to the ground. Young testified that appellant was wearing a black sweat hood and white shorts, which was consistent with Ms. Taylor's description of appellant's clothing. He also testified that he recognized appellant by his face, specifically his eyes, nose, and mouth. Arnold also described the shooter by the name, Reggie, and said that he was dark-skinned with teeth which protruded. Arnold also testified that he saw appellant the next day standing in the area where appellant shot Ms. Davis. At that time, he heard him say, "That's where I got the b[ ] at." Arnold identified at trial a photograph of appellant in which appellant was wearing the same clothes he had worn the night of the shooting.

Reba Young, who was nine years old at the time of the shooting and eleven years old at the time of trial, testified that while on her way to the store with her cousin, Arnold, she saw a woman running through the parking lot who was screaming and holding the back of her head. According to Reba, the woman stopped beside her, and the man who had been chasing her shot her and continued to shoot her even after she fell. Reba Young testified that she saw the man's eyes, nose, and mouth and that his teeth "stuck out." She said that she recognized that the shooter was appellant. She also described appellant's clothing on that night as a black sweatshirt with the hood up and beige or faded shorts. She also identified appellant by name.

The next night, according to Reba, she was walking again with her cousin to the store when she saw appellant standing in the parking lot near the spot where he had shot Ms. Davis. At that time, she heard him say to the others who were standing around, "This is where I done it, B." Although this witness said that she could not see appellant's face on the second night, she said that she recognized his voice. Reba Young also identified a photograph of appellant and testified that she was seeing it for the first time at trial. She testified that the photograph depicted appellant wearing the same sweatshirt which he was wearing on the night of the shooting.

Another witness for the government, Janell Dedrew, testified that while standing in front of 700 12th Street, S.E. on the night of the shooting, she heard gunshots and observed a man shoot Ms. Davis. According to Ms. Dedrew, the man was wearing a sweatshirt with the hood up on his head and some pants. This witness testified that she could see only the back of the man's head.

Prior to trial, appellant filed a motion in limine seeking permission to introduce at trial evidence purportedly tending to show that it was Edward Huff who committed the murder of Deborah Davis. Appellant sought to show that Huff had a motive for killing Ms. Davis and that he had committed extremely violent acts against her previously. According to appellant's proffer, on June 25, 1990, about one month before the fatal shooting, James Bias, Freddie Artis and Ms. Davis were arrested on charges of armed robbery, and Artis and Davis were released on bond.

On June 26, 1990, Artis, who was joined at some point by Huff, kidnapped Ms. Davis, and transported her to Maryland where she was stabbed, shot and left for dead because her kidnappers suspected her of being a witness against Bias and Artis in the armed robbery case. Ms. Davis survived and identified her assailants as Artis and Huff.

On July 26, 1990, Ms. Davis testified before the grand jury. Later that day, she called her mother and said, "They're after me. They are going to get me. The word is out on the street." Appellant further proffered that when the black male shot Ms. Davis that night, he was heard to say, "You won't tell this." According to the proffer, appellant was not connected with Artis, Huff, or Bias. The government represented that a photograph of Mr. Huff was placed in a photo array and shown to several witnesses, none of whom identified him as the shooter.[2]

Although the trial court stated it initially thought that the evidence that Mr. Huff had a motive to kill Ms. Davis was compelling motive evidence, it was persuaded in its decision to exclude the evidence by the fact that the ultimate issue for determining the admissibility of the evidence was "whether or not Mr. Huff or any other person is clearly connected to the shooting itself." On this issue, the trial court concluded that the requisite connection between Huff and the crimes charged was missing. Specifically, the trial court found that there was no evidence (1) that anyone who had an opportunity to view the shooter had identified Huff as the shooter even though some looked at a photo array which included his picture; (2) that Huff was anywhere near the scene of the murder that night or had the opportunity to commit the crime; (3) that Huff knew that Davis had testified in the grand jury that day; or, (4) that he knew where she could be located on the night of her death. Therefore, the trial court denied the motion, explaining its ruling, in pertinent part, as follows:

The inherent ambiguity of this evidence supposedly linking Mr. Huff to the murder would not ... tend to create a reasonable doubt that the defendant who was apparently known by many of the eye witnesses did not commit the offense.

Furthermore, given the quality of the evidence proffered and even assuming its relevance, its probity ... in clearly linking Mr. Huff to the murder is so weak and the resulting potential of the evidence to confuse and mislead the jury so great that the Court concludes that on the state of the present record the defense should be precluded from presenting any evidence to show that Mr. Huff may have killed the decedent....

The trial court also determined that "the physical description allegedly linking Mr. Huff to the shooting by the defense witnesses" to be so general that it could fit any number of people. It further found the words attributed by appellant's proffer to the shooter, i.e., "You won't tell this," not to be so distinctive as to tie Mr. Huff to the murder of Ms. Davis. Finally, the trial court examined a photograph of a man selected by one individual as the assailant, which appellant contended looked like Mr. Huff. As to this photograph, the trial court determined that "a recent photograph of Mr. Huff failed to demonstrate any facial similarities between the two individuals other than that both were black males of approximately the same age and complexion.[3] The trial court denied appellant's motion in limine without prejudice to his right to renew it after witnesses had testified. The court also explained that its ruling did not preclude appellant from showing that other witnesses had identified persons other than the accused as the gunman or from otherwise challenging the reliability of the government's identification evidence, including any showing of bias on the part of its witnesses.

2. Appellant argued that the photograph was dated and did not show Mr. Huff's substantial change in appearance at his age. However, appellant did not show a later photograph of Mr. Huff to anyone. Appellant also contended that some of the physical descriptions for the assailant ranged from 5'4", 110 pounds to 6'2", 210 pounds, all black male. Thus, appellant argued

that some of these general characteristics were consistent with Huff's appearance.

3. We do not read appellant's brief as challenging these factual findings made by the court after examination of the proffered evidence.

## II.

Appellant argues that the trial court erred in precluding him from introducing the proffered evidence to show that someone else, namely Edward Huff, committed the murder. He contends that the trial court's ruling on this issue precluded him from presenting a defense, thereby violating his constitutional rights.

■■■ Undisputedly, the right of the accused to present a defense is a fundamental one. *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S.Ct. 1038, 1045, 35 L.Ed.2d 297 (1973); *see also Nelson v. United States*, 649 A.2d 301, 304 (D.C.1994). "The due process clause and the Sixth Amendment afford a defendant the right to confront and cross-examine witnesses against him" and to call witnesses in order to present a defense. *Watson v. United States*, 612 A.2d 179, 182 (D.C.1992); *(Woredell) Johnson v. United States*, 552 A.2d 513, 516 (D.C.1989). Thus, a defendant may offer in defense of a criminal charge evidence that it was not he, but someone else, who committed the offense. *Nelson*, 649 A.2d at 304; *Watson*, 612 A.2d at 182; *(Woredell) Johnson*, 552 A.2d at 516; *Stack v. United States*, 519 A.2d 147, 152 (D.C.1986); *Beale v. United States*, 465 A.2d 796, 803 (D.C.1983), *cert. denied*, 465 U.S. 1030, 104 S.Ct. 1293, 79 L.Ed.2d 694 (1984).

■■■ However, the right of an accused to present evidence is not absolute; it is subject to the requirements of relevancy or " 'to accommodate other legitimate interests in the criminal trial process.' " *Nelson, supra*, 649 A.2d at 304; (quoting *Chambers, supra*, 410 U.S. at 295, 93 S.Ct. at 1046). The evidentiary rule for admission of evidence purporting to show that another person committed the crimes charged is well settled in this jurisdiction. "Before evidence that there is a reasonable probability that someone else committed the charged offense can be deemed relevant, and thereby admissible, the evidence must 'clearly link' the other person to the commission of the crime." *Watson, supra*, 612 A.2d at 182; *(Woredell) Johnson, supra*, 552 A.2d at 516. In this context, the term "clearly link" has been defined as follows:

> What we mean by "clearly link," as used first by this court in *Brown [v. United States*, 409 A.2d 1093 (D.C.1979) ], . . . is proof of facts or circumstances which tend to indicate some reasonable possibility that a person other than the defendant committed the charged offense. This proof permits the admission of evidence which otherwise is generally excluded because it is too remote in time and place, completely unrelated or irrelevant to the offense charged, or too speculative with respect to the third party's guilt.

*Id.; see also Watson*, 612 A.2d at 182; *see, e.g., Stack, supra*, 519 A.2d at 153–54; *Beale, supra*, 465 A.2d at 803. "There is no requirement that the proffered evidence must prove or even raise a strong probability that someone other than the defendant committed the offense." *Johnson*, 552 A.2d at 517. However, the focus is on the effect of the evidence upon the defendant's culpability, rather than its effect on the third party. *Id.*

■■■ Although evidence of a third person's motives, actions, opportunity and statements are of the type which may be used to establish the requisite link to the crime charged in the case, to be admissible, the proffered evidence in the aggregate must establish "the necessary link, connection or nexus between the proffered evidence and the crime at issue." *(Woredell) Johnson, supra*, 552 A.2d at 516 (citations omitted). Thus, we have held that a defendant's proffer of evidence that other individuals had even stronger motives to murder the victim than the accused was insufficient, without more, to establish the necessary link to the offense charged to render the evidence admissible at trial. *Beale, supra*, 465 A.2d at 803.[4] In *Beale*, this court ruled that the trial court did not abuse its discretion in precluding Beale from calling four witnesses who would testify that other individuals had as much, or a greater, motive than the accused to commit the murder. *Id.* The critical omissions from the proffer by the defense in *Beale*, were "any evidence that those other individuals,

4. Similarly, evidence of "[m]ere opportunity is insufficient." *Morris v. United States*, 622 A.2d 1116, 1127 (D.C.), *cert. denied,* —— U.S. ——, 114 S.Ct. 270, 126 L.Ed.2d 221 (1993).

assertedly with motives to kill the victim ..., were in the area at the time of the shooting" or evidence "linking these [prior] events to the subsequent murder." *Id.* Since there was no showing that the proffered evidence was related to "the facts surrounding the crime at issue," this court held that the trial court did not err in refusing to admit it.

■ The proffer of motive alone is not sufficient to meet the foundation for admissibility in this jurisdiction which requires a nexus between the proffered evidence and the charged crime. *Freeland v. United States,* 631 A.2d 1186, 1189–90 (D.C.1993). Unless the motive of the third party is connected with the act for which appellant is on trial, it has no relationship or relevance to the issues. *Shepard v. United States,* 538 A.2d 1115, 1118 (D.C.1988). This has long been the general rule.

> Evidence of the motive of one other than the defendant to commit the crime is not admissible where there is no other proof in the case which tends to connect such other person with the offense with which the defendant is charged.

29 AM.JUR.2D *Evidence* § 441, p. 502 (1967).[5]

■ Even threats against the crime victim are not relevant, "unless the third person is an accomplice or accessory of the accused" or unless the third person is implicated by other evidence in some way to the crime charged. 1 Charles E. Torcia, WHARTON'S CRIMINAL EVIDENCE, § 145, pp. 595–96 (14th ed. 1985); *see also* 29 AM.JUR.2D *Evidence* § 441, p. 501 (1967). These general principles are consistent with our holdings requiring some nexus of the third person to the facts surrounding the crime at issue in the case. *See Morris, supra* note 4, 622 A.2d at 1127 (D.C.1993); *Shepard, supra,* 538 A.2d at 1117–18; *Beale,*

*supra,* 465 A.2d at 803; *Brown, supra,* 409 A.2d at 1097.

■ In this case, although there was evidence that Huff had a motive to commit the crime and a proffer that Huff had committed other acts of violence against the victim on another occasion, no evidence was proffered tending to show that Huff was implicated in the commission of the offenses for which appellant was on trial. Appellant conceded in the motion that he was not connected to Artis, Huff, and Bias. There is no claim that Huff was at or near the scene of the crime nor that he even knew that he could find Ms. Davis there that night. Not a single person who witnessed the crime, even those who viewed photo arrays with Huff's picture in it, identified him either as the perpetrator of the crime or as someone who was even in the area of the crime scene at any time that night. It would require impermissible speculation to provide the missing link between the prior events involving Huff and his cohorts and the subsequent murder of Ms. Davis. Contrary to the position by our dissenting colleague, the coincidence of a motive, even a strong one, and prior assaults on the victim by a third party, without more, are insufficient. Some link or nexus between such proffered events and the crimes involved in the case before the court must be shown. *(Woredell) Johnson, supra,* 552 A.2d at 516; *Beale, supra,* 465 A.2d at 796.

■ We review the trial court's decision that the proffered evidence did not meet the requirements of relevancy for an abuse of discretion. *Shepard, supra,* 538 A.2d at 1116; *Beale, supra,* 465 A.2d at 803; *Parks v. United States,* 451 A.2d 591, 607 (D.C. 1982), *cert. denied,* 461 U.S. 945, 103 S.Ct. 2123, 77 L.Ed.2d 1303 (1983). On this record, we cannot say that the trial court abused

---

**5.** *See, e.g., People v. Hall,* 41 Cal.3d 826, 226 Cal.Rptr. 112, 116–17, 718 P.2d 99, 104 (1986) (en banc) (mere evidence of motive and threats of another without evidence tending to connect the other person with the crime on trial inadmissible); *State v. Hill,* 495 A.2d 699, 703 (Conn. 1985) (evidence of another's motive insufficient for admissibility absent other proof other proof tending to connect other person with offense charged); *State v. Sturdivant,* 31 N.J. 165, 155 A.2d 771, 778 (1959) (not sufficient to show some hostile event and leave to speculation its connec-

tion with crime charged); *State v. Long,* 95 Vt. 485, 115 A. 734, 738 (1922) (motive and threats, standing alone, insufficient to support admissibility); *State v. Kwan,* 174 Wash. 528, 25 P.2d 104, 106 (1933) (motive coupled with threats of third person inadmissible unless it tends to connect such person with actual commission of crime charged); *State v. Denny,* 120 Wis.2d 614, 357 N.W.2d 12, 16, 17 (App.1984) (absent evidence of opportunity or direct connection of third person to the crime, evidence of that person's motive to commit it properly excluded).

its discretion in determining that the proffered evidence would have no bearing on appellant's culpability and would only confuse and mislead the jury. *See Brown, supra*, 409 A.2d at 1097.

We are not persuaded, as appellant argues, that our decision in *Freeland* supports a contrary result because the case may be distinguished upon its facts. In *Freeland*, this court found that the combination of facts and circumstances involving prior threats was sufficient to show the requisite nexus between the crime charged to require admission of evidence that someone else committed the murder. 631 A.2d at 1189. Unlike this case, Freeland's proffer consisted of more than a motive to commit the offense. Freeland testified that he had witnessed an inmate named Hawthorne, who was known to be a dangerous individual, kill another inmate and that he was a witness for the prosecution arising out of these events; that he had testified before the grand jury and was scheduled to testify at Hawthorne's trial; that persons claiming to be Hawthorne's agents had approached him personally and threatened him and his family repeatedly for cooperating in the prosecution; that late on the night before Freeland's wife's body was discovered, two of these men again confronted and grabbed him, but he managed to escape to his home; that he left the home after trying unsuccessfully to persuade his wife to leave with him for her safety; and that his wife was found murdered in the home at 10:00 a.m. the next day. *Id.* at 1188–89. Significantly, this court observed that Freeland's encounter with the men near his home afforded them an opportunity to find out where Freeland lived. *Id.* at 1189 n. 2.

In the case before this court, there is no evidence of opportunity on the night of the crime. There was no evidence that it was

Huff who threatened the victim just before the murder. Moreover, the majority in *Freeland*, having acknowledged that motive alone may not suffice to meet the foundational requirements for admission of this type of evidence, determined that "the probative value of the proffer was strengthened by the circumstantial nature of the government's evidence of appellant's guilt, in contrast to *Beale* ... where three eyewitnesses testified that the defendant had shot the victim." [6] *Freeland, supra*, 631 A.2d at 1190. Unlike *Freeland*, the case against appellant was not circumstantial, but rather based upon the testimony of many witnesses who observed the crime and identified appellant as the person who committed it. In *Freeland*, this court was persuaded that "[t]he probative value of the proffer was strengthened by the circumstantial nature of the government's evidence of appellant's guilt...." *Id.* at 1190. In contrast, the nature of the evidence against appellant in this case does not strengthen the probative value of appellant's proffer or support the argument that the trial court abused its discretion.

To support his theory that evidence that Huff had a motive to commit the murder should have been admitted at trial, appellant now relies upon a proffer of the substance of an alleged telephone call which the decedent made to her mother on the day she was murdered. He contends that the call, which conveyed that "they were out to get her," takes the evidence beyond mere motive and "confirms Mr. Huff's knowledge of Ms. Davis' grand jury testimony, his intent to kill her and his opportunity to do so." First, appellant did not proffer the substance of this telephone call in his motion *in limine* nor in the oral proffer related to the issue.[7] However, the government concedes that the information was placed in the record in another context before the court ruled on the

---

6. In *Freeland,* the evidence showed that appellant had argued with his wife in the early morning hours preceding her death and that he was seen outside the apartment about two hours before the body was discovered. 631 A.2d at 1187–88. There were no eyewitnesses to the murder. Freeland contended that he had argued with his wife about whether she would leave with him and that he left the family apartment believing that his family would be safe thereafter.

7. A party must apprise the court of all relevant factors pertaining to the issue under consideration in order for the court to make an informed and rational judgment. *Hollingsworth v. United States*, 531 A.2d 973, 981 (D.C.1987) (quoting *(James) Johnson v. United States*, 398 A.2d 354, 365 (D.C.1979)).

motion *in limine*. Even assuming that the issue of the impact of the information was properly preserved for review,[8] the reported telephone call failed to provide a nexus between the murder and Edward Huff. It does not appear that Ms. Davis ever identified any of the individuals to whom she referred when she said that "they" were out to get her. The proffer did not place the call in the context of any discussion about the prior events involving Huff, Artis, and Bias. The reference is to more than one unidentified person. While such evidence may support appellant's claim that someone was out to get the decedent, it does not provide the connection between Huff and the crime charged in this case. *See (Woredell) Johnson, supra,* 552 A.2d at 516. If evidence of a third party's involvement in the crime were admissible based solely upon who had a motive or ill will against the victim at the time of its commission, undoubtedly, a defendant could point to many such individuals for a victim who associates with a criminal element. *See People v. Hall,* 41 Cal.3d 826, 226 Cal.Rptr. 112, 117–18, 718 P.2d 99, 105 (1986). No doubt, this is among the reasons that the law of this jurisdiction and elsewhere requires at least some showing of a nexus between the alleged evidence of third-party culpability and the charges on trial before the court. *Shepard, supra,* 538 A.2d at 1118; *Beale, supra,* 465 A.2d at 803. As the trial court determined, that nexus is simply absent here.

 Even in cases where such evidence is admissible, the trial court retains discretion to exclude it after weighing its probative value against its prejudicial effect, including its tendency to mislead and confuse the jury. *Watson, supra,* 612 A.2d at 182; *Brown, supra,* 409 A.2d at 1097. The record reflects that the trial court undertook such an analysis and concluded that, even assuming some relevance of the proffered evidence, its probative value "was so weak and the resulting potential of the evidence to confuse and mislead the jury so great" that it should be excluded. We cannot say on this record that

the trial court abused its discretion in making this determination. *See id.*

For the foregoing reasons, the judgments of conviction appealed from hereby are

*Affirmed.*

SCHWELB, Associate Judge, dissenting:

The government's theory of this case presupposes that on the very day of her appearance at the United States Attorney's office to tell prosecutors and the grand jury about the armed robbery, kidnapping, and attempted murder allegedly committed by Huff, Artis and Bias, Deborah Davis was shot to death by a man who alluded to her "snitching" but who had no known connection with the grievous crimes which the three men were said to have committed, or with any individual member of that triumvirate. If this is what occurred, then the court was presented with what one can only describe as a remarkable coincidence. "Coincidences happen, but an alternative explanation not predicated on happenstance is often the one that has the ring of truth." *Tursio v. United States,* 634 A.2d 1205, 1213 (D.C.1993) (quoting *Poulnot v. District of Columbia,* 608 A.2d 134, 139 (D.C.1992)). A dose of life experience may make a wise juror wary of spectacular coincidences and reluctant, in a given case, to believe that one has occurred.

As a result of the trial judge's ruling on the motion *in limine,* however, the jury was never informed that the prosecution's case against Winfield rested on what an impartial trier of fact might reasonably view as a very unusual coincidence indeed. The case was thus tried on an artificially constricted record which, in my opinion, provided the jury with a selective (and therefore misleading) reconstruction of the relevant facts. Indeed, the jurors learned next to nothing about the stormy last month or so of the decedent's life, and the question of the killer's motive was dismissed by the prosecutor in closing argument as something the government was not required to prove. The obvious motive of Huff and his confreres, and the threats and assault alleged to have been so recently car-

---

**8.** *See District of Columbia v. Barriteau,* 399 A.2d 563, 569 (D.C.1979) (to properly preserve for review exclusion of evidence, offer of proof gen-

erally required); *see also Jamison v. United States,* 600 A.2d 65, 70 (D.C.1991).

ried out by them pursuant to that motive, were not disclosed to the jury at all. Because I believe that Winfield was deprived of his constitutional right to present relevant and exculpatory evidence, and that he was therefore denied a fair trial, I respectfully dissent from the affirmance of his conviction.

### I.

In order to demonstrate the extent to which the government's theory presupposed a coincidence of which the jurors were not apprised, I briefly outline the facts relied upon by the defense to support its theory that Huff may have killed Ms. Davis, and that there was therefore a reasonable doubt of Winfield's guilt.[1] On June 16, 1990, Artis, Bias and Ms. Davis were arrested and charged with armed robbery. Bias was unable to post bond, but Artis and Ms. Davis were released. Artis apparently suspected Ms. Davis of having cooperated with the prosecutors. On June 26, 1990, Artis, who was later joined by Huff, abducted Ms. Davis, drove her to Prince George's County, Maryland. Artis, in Huff's presence, threatened to kill her for "snitching." Ms. Davis was stabbed, shot and left for dead. She managed to summon help, and she survived her injuries. On June 28, 1990, Artis was arrested, but Huff remained at large.

Charges were brought against Huff and Artis, both in the District of Columbia and in Prince George's County, in connection with the kidnapping and shooting of Ms. Davis. On July 26, 1990, only one month after the kidnapping, Ms. Davis, who was cooperating with prosecutors, appeared at the United States Attorney's office and testified before

the grand jury. A few hours later, Ms. Davis was shot to death by a man who pointedly referred to her "snitching": "you won't tell this."[2]

While considering the cross-motions *in limine*, the judge described Huff's motive to kill Ms. Davis as "compelling," and as "extraordinarily strong;" indeed, he expressed the view that "except for opportunity to commit the offense, there are very few cases which would probably be as compelling as to motive." The judge also considered the shooter's remark to Ms. Davis—"[y]ou won't tell this"—but concluded that these words were "not so distinctive that they *necessarily* tie[d] Mr. Huff to the shooting by relating back to words allegedly spoken by Mr. Artis in Mr. Huff's presence." (Emphasis added). Noting that no eye-witness had identified Huff's photograph,[3] and that there was no proof that Huff knew of Ms. Davis' appearance before the grand jury or was in the area at the time of her murder, the judge concluded that Huff's motive alone was insufficient to permit the introduction of evidence tending to inculpate Huff, that the proffered evidence did not "clearly link" Huff to the crime, and that its admission would potentially confuse and mislead the jury.

### II.

According to the majority, the trial judge did not abuse his discretion in granting the government's motion *in limine* because "motive alone" is "generally insufficient" to permit a defendant to introduce evidence tending to prove that someone else committed the crime. Assuming this proposition to be true,[4] this is hardly a case of "motive alone."

---

1. Most of these facts are summarized in the government's motion *in limine,* and do not appear to be disputed.

2. A prosecution witness later testified that the killer rhetorically inquired of Ms. Davis, as he shot her, whether she "like[d] snitching, bitch."

3. Winfield's attorney claimed, however, that the photograph of Huff was too old and did not resemble Huff's present appearance. She also contended that one witness had selected the picture of a third man who somewhat resembled Huff. The judge found that Huff did not resemble Winfield, but made no finding as to whether

he resembled the person whose picture the witness chose.

4. In one of this court's most recent decisions on the issue, we observed that "a proffer of motive alone *may not* suffice in meeting the *Brown/Beale* burden...." *Freeland v. United States,* 631 A.2d 1186, 1190 (D.C.1993) (emphasis added) (citing *Brown v. United States,* 409 A.2d 1093 (D.C.1979) and *Beale v. United States,* 465 A.2d 796, 803 (D.C.1983), *cert. denied,* 465 U.S. 1030, 104 S.Ct. 1293, 79 L.Ed.2d 694 (1984)). In *Martin v. United States,* 606 A.2d 120 (D.C.1991), this court stated that "[m]otive is evidence of the commission of any crime," *id.* at 128 (citations omitted), and emphasized that evidence of mo-

The evidence which the judge excluded was designed to demonstrate:

1. that Ms. Davis allegedly "snitched" against Artis and Bias, thus providing them with the initial motive to harm or kill her;

2. that within a few days, Artis and Huff, acting in conformity with this motive, in fact threatened to kill her;

3. that the two men then attempted to carry out their threat by shooting and stabbing Ms. Davis (whom Artis had previously kidnapped) and by leaving her to die;

4. that in July, having survived the first attempt to silence her, Ms. Davis "snitched" again, exposing Huff and Artis to possible incarceration for the remainder of their lives, and thus creating an enhanced and urgent motive for them to finish the job that they had started in June;

5. that Huff was at liberty at the time Ms. Davis was killed, that he and Artis had located Ms. Davis previously, and that to that extent Huff had the opportunity to commit the crime; and

6. that the killer shot Ms. Davis to death on the day that she appeared before the grand jury, and that he voiced concern with her "snitching"—the very activity that precipitated the earlier threats and deadly assault; and

7. that there was no known or demonstrated connection between Winfield and any member of the Artis–Bias–Huff group.[5]

The existence of a latent motive is one thing; proof that a person not only had such a motive, but that he had acted pursuant to it quite recently (and almost killed the decedent) is quite another. *See, e.g., Alexander v. United States,* 138 U.S. 353, 356, 11 S.Ct. 350, 351, 34 L.Ed. 954 (1891); *Commonwealth v. Ferreira,* 381 Mass. 306, 409 N.E.2d 188, 192 (1980) ("[s]tatements, not too remote in time, which indicate an intention to engage in particular conduct, are admissible to prove that the conduct was, in fact, put in effect"). Where threats by a third party have not been carried out, the authorities are divided as to whether evidence of their utterance is admissible, but the better-reasoned decisions would permit such proof. *See* 1A WIGMORE, *supra,* §§ 140 & 141 n. 1, at 1725–28.[6] I know of no precedent, in any event, for excluding evidence of such threats where, as here, a recent and deadly attempt has been made to carry them out, and where the murderer's words at the scene suggested

---

tive or lack thereof is generally admissible and that exclusion of such evidence may well require reversal of a defendant's conviction. *Id.* at 128–29. Professor Wigmore has written, in connection with the admissibility of evidence that someone other than the defendant committed the crime, that

> [a] motive as evidence is perhaps not of such value as a threat, yet courts seem more inclined to receive it. There is no reason for requiring that it be coupled with other evidence in order to be admissible.

1A JOHN HENRY WIGMORE, EVIDENCE, § 141, at 1727 (Tillers ed. 1983) (emphasis added).

Generalizations do not decide concrete cases. Not every conceivable motive would be sufficient to permit a defendant to argue that another person committed the crime. If Lee Harvey Oswald had lived and faced trial for assassinating President Kennedy, for example, the judge could properly proscribe any attempt by Oswald's counsel to ask the jury to speculate that some hypothetical political rival committed the murder and that the rival's motive was to become President. But where, as in this case, Huff's motive to kill Ms. Davis was powerful, and closely relat-

ed in time and circumstances to the decedent's death, the evidence should be admitted.

> [I]f the evidence is really of no appreciable value no harm is done in admitting it; but if the evidence is in truth calculated to cause the jury to doubt, the court should not attempt to decide for the jury that this doubt is purely speculative and fantastic but should afford the accused every opportunity to create that doubt. A contrary rule is unfair to a really innocent accused.

1A WIGMORE, *supra,* § 139, at 1724.

5. I note that the government has not provided any explanation why someone having no connection with the Huff triumvirate would coincidentally allude, in killing Ms. Davis, to the very concerns which led Artis and Huff to try to murder her a short time earlier.

6. Dean Wigmore has criticized courts which exclude evidence of threats by a third party for a "wholly unnecessary strictness," and has added that "the illiberal attitude of some courts in this respect toward accused persons is in singular contrast with the maudlin tenderness otherwise often exhibited." *Id.,* § 140, at 1725.

that his motive was identical to the motive of the Artis–Bias–Huff triumvirate.

The judge's refusal to admit evidence as probative as that excluded here may have had its genesis in the loose use of language in some of our precedents. In *Brown, supra* note 4, 409 A.2d at 1097, this court stated that, to be admissible, evidence offered to prove that another person may have committed the offense must "clearly link that other person to the commission of the crime." If the words "clearly link" are read literally, something very like proof of the other person's guilt would arguably be a precondition for the admission of the evidence. But such an approach confuses relevance with conclusiveness and requires the defendant to demonstrate the latter at a point when only the former is at issue. This is contrary to established law, for "[i]t is enough [for purposes of admissibility] if the item could reasonably show that a fact is slightly more probable than it would appear without that evidence.... A brick is not a wall." *Martin, supra* note 4, 606 A.2d at 128–29 (citations omitted).

In *Johnson v. United States,* 552 A.2d 513 (D.C.1989), this court clarified the meaning of "clearly link" and eliminated any doubt that relevance, rather than virtual proof of the third party's guilt, is the touchstone:

What we mean by "clearly link," as used first by this court in *Brown, supra,* 409

A.2d at 1097, is proof of facts or circumstances which tend to indicate some *reasonable possibility* that a person other than the defendant committed the charged offense. This proof permits the admission of evidence which otherwise is generally excluded because it is too remote in time and place, completely unrelated or irrelevant to the offense charged, or too speculative with respect to the third party's guilt.

*Id.* at 516 (emphasis added; citations omitted). We went on to explain that the proffered evidence may be circumstantial or direct,[7] and "may include, for example, a third party's actions, motives, opportunity, statements and declarations against penal interest." *Id.* (citations omitted). While the proffered evidence "should not be too remote in time"[8] or too weak in probative quality, and should be closely related to the facts of the case against the defendant,

[t]here is no requirement that the proffered evidence must prove or even raise a strong probability that someone other than the defendant committed the offense.

*Id.* at 517.[9]

In *Freeland, supra,* note 4, this court recently reversed a conviction for reasons similar to those asserted by Winfield in the present case. Freeland was charged with the murder of his wife. At trial, he proffered, *inter alia,* that he had testified before the

---

7. The proffered defense evidence could not properly be excluded on the basis of the existence of direct eyewitness testimony identifying Winfield as the murderer. In spite of some problematic language in *Freeland,* 631 A.2d at 1190, which is unnecessary to the disposition of that case, the *admissibility* of proffered defense evidence cannot depend on whether, in the court's view, the prosecution's case is a strong one, nor does it matter whether the government's evidence, as in this case, was direct rather than circumstantial. To illustrate, the judge surely could not exclude a defendant's alibi evidence because witnesses identified him as the murderer; the same principle applies here.

Moreover, "circumstantial evidence may be more certain, satisfying and persuasive than direct evidence." *Janifer v. Jandebeur,* 551 A.2d 1351, 1352 (D.C.1989) (citations omitted). Accordingly, Winfield's proffer regarding Huff was not rendered insufficient by the prospective testimony of several prosecution witnesses identifying Winfield as the gunman. In any event, the reliability of these witnesses (two of them young

children) and their opportunity to observe, were vigorously challenged, and Winfield presented a substantial defense of his own. It is not at all obvious that the jurors would have credited the prosecution witnesses if they had known of the evidence pointing to Huff and his associates.

8. This disapproval of temporal remoteness seems at odds with the last sentence of the preceding quotation from *Johnson* which is recited in the text.

9. More recently, in *Ford v. United States,* 616 A.2d 1245 (D.C.1992), this court, after quoting from *Johnson,* went on to state that

it is not a question of absolute proof, nor even of strong probability, but only of raising a reasonable doubt about A's commission of the offense *and for this purpose the slightest likelihood of B's commission may suffice or at least assist.*

*Id.* at 1249 (quoting 1A WIGMORE, *supra,* § 139, at 1724 (emphasis added; internal brackets omitted)).

grand jury and was scheduled to testify at trial as a witness against one Hawthorne, a murderer; that persons claiming to be acting on Hawthorne's behalf had threatened Freeland and his family; that Hawthorne had in the past intimidated witnesses against him; and that he (Freeland) had told police before the killing that he apprehended reprisals against his family from Hawthorne or his confederates. 631 A.2d at 1189.[10] Freeland contended that this evidence would tend to show a reasonable probability that someone else had killed Freeland's wife in order to punish and silence Freeland. The trial judge excluded the proffered evidence, noting that there was no proof placing Hawthorne or any agent of Hawthorne at or near the scene, and that the nexus required by *Brown* and *Beale* was therefore lacking. Relying largely on the explanation in *Johnson* of the *Brown/Beale* "clearly link" test, this court held that the proffer was sufficient, adding that

> [g]iven this proffer, the fact that the defense did not also proffer that it could produce direct evidence placing Hawthorne or his agents at appellant's home at the relevant time is not dispositive.

*Id.*[11]

In the present case, Winfield proffered not only that Huff and Artis had threatened to kill the decedent—just as Hawthorne's agents had allegedly threatened both Freeland and his wife—but also that they had attempted to carry out their threat by shooting and stabbing her. *Cf. Stack v. United States,* 519 A.2d 147, 153 (D.C.1986) (holding that evidence of past beatings allegedly administered by decedent's boyfriend was im-

properly excluded in defendant's murder prosecution). A person who has tried to kill a "snitch" for telling prosecutors about one crime might reasonably be expected to try again after she has "snitched" again about even more serious crimes. "[A] [real or potential] defendant's past conduct is important evidence—perhaps the most important—in predicting his probable future conduct." *Cruz–Foster v. Foster,* 597 A.2d 927, 930 (D.C.1991).[12] To ignore this is to ignore reality.

### III.

The foregoing discussion will doubtless convince the reader that, if I had been the trial judge, I would have denied the government's motion *in limine.* That, however, is not dispositive. "The trial court's decision that proffered evidence is not sufficiently relevant or probative is reviewable only for an abuse of discretion." *Beale, supra,* 465 A.2d at 803; *see also Watson v. United States,* 612 A.2d 179, 182–83 (D.C.1992). There is no doubt that the trial judge carefully considered the arguments of counsel, familiarized himself with the precedents, and called the issue as he saw it, relying heavily on the words "clearly link."

Nevertheless, I do not believe that the judge's decision can properly be sustained. First, a criminal defendant's right to present evidence in his own defense is a fundamental element of due process. *Martin, supra,* 606 A.2d at 127. Courts are "especially solicitous" in protecting it. *Id.* at 130–31. The

---

10. Winfield proffered evidence in the present case that the decedent had telephoned her mother after she testified before the grand jury, and only hours before her death, and that she had stated that the word was out on the street that "they" were out to get her. Although this evidence had considerable potential—it would be a remarkable coincidence if the "they" to whom Ms. Davis referred were unconnected with the people whom she was helping to propel toward the penitentiary by her grand jury testimony—Winfield's attorney did not rely on it in her motion *in limine* (she had, however, previously brought the alleged telephone conversation to the court's attention in another connection). Moreover, it is not readily apparent how the proponent of such testimony could have successfully responded to a hearsay objection.

11. The present case is even stronger for the defense than *Freeland* in this respect. Artis and Huff knew enough about Ms. Davis' whereabouts a month before her death to enable them to kidnap her, reprove her for "snitching," shoot her, stab her, and leave her for dead. The majority's suggestion that Huff lacked the opportunity to kill Ms. Davis appears somewhat strained on this particular record.

12. This proposition is supported not only by common sense, but also by empirical studies. *See State v. Krol,* 68 N.J. 236, 344 A.2d 289, 302 & n. 12 (1975), and authorities there cited.

trial judge was obliged to exercise his discretion with this constitutional backdrop in mind. *Id.* at 132. The exclusion of the evidence which Winfield proffered in this case was, in my opinion, potentially devastating.

Second, judicial discretion must be founded upon correct legal principles. "[A] trial court abuses its discretion when it rests its conclusion on incorrect legal standards." *In re J.D.C.,* 594 A.2d 70, 75 (D.C.1991). Perhaps as a result of loose language in our past cases, I believe that this is what happened here.

The judge in this case, like the trial judge in *Freeland,* read the words "clearly link" as placing a burden on the defendant far greater than *Johnson* and our other cases contemplate. This is readily apparent from the judge's treatment of the murderer's remark, at the time he shot Ms. Davis, that "you won't tell this." According to the judge, these words did not *necessarily* show that the speaker was one of the men present when the decedent was kidnapped threatened, and shot (and therefore presumably did not establish that the murderer was also involved in the earlier assault on the decedent). This is undoubtedly true, but the judge's statement answered the wrong question. The issue, under *Johnson,* was not whether the speaker *necessarily* participated in the abduction and shooting of Ms. Davis, but rather whether the murderer's utterance of these words, together with the other evidence, made it more likely that he was one of the threat-makers, and thus that Huff (or possibly an associate) and not Winfield was guilty of the charged offense.[13]

The judge also ruled that admission of the evidence proffered by Winfield would have potentially confused and misled the jury, and was thus more prejudicial than probative.[14] In my opinion, the opposite is true. The exclusion of evidence which embraced the most important events of the last six weeks

of the decedent's life affirmatively misled the jurors because it denied them information about a critical fact, namely, that if Winfield killed Ms. Davis but had no connection with the Huff triumvirate, then a colossal coincidence had occurred. This court, sitting en banc, recently stated that probative evidence, as well as arguments based on reasonable inferences from such evidence, should not be excluded because of "crabbed notions of relevance or excessive mistrust of juries." *Allen v. United States,* 603 A.2d 1219, 1224 (D.C. 1992) (en banc) (quoting *Riordan v. Kempiners,* 831 F.2d 690, 698 (7th Cir.1987), *cert. denied,* —— U.S. ——, 112 S.Ct. 3050, 120 L.Ed.2d 916 (1992)). The evidence which the defendant sought unsuccessfully to exclude in *Allen* was presented by the prosecution. *Allen's* reasoning applies *a fortiori* where a criminal defendant's constitutional right to present exculpatory testimony is implicated. To deny relevant defense evidence to the jurors because it may "confuse" the jury tends in my view, albeit unintentionally, to usurp the jury's prerogative.

---

The interpretation in *Johnson* of the phrase "clearly link" is arguably not the most literal rendition of these words. This court did not explicitly say in *Johnson,* however, that it was departing from rigorous literalism, and the judge in this case attempted to apply these words literally.[15] Under these circumstances, "abuse of discretion" comes across as too pejorative a characterization. I therefore note once again that "abuse of discretion is a phrase which sounds worse than it is.... The term does not imply ... any reflection on the judge." *King v. United States,* 550 A.2d 348, 353 n. 3 (D.C.1988) (quoting *United States v. Walker,* 772 F.2d 1172, 1176 n. 9 (5th Cir.1985)).

## IV.

Although each case has its own distinctive facts, it is difficult for me to see how the

---

**13.** I note, incidentally, that according to the government's submission to the trial court, Huff was originally the police's prime suspect.

**14.** "Even when [evidence tending to inculpate a third party] is relevant, the trial court must

weigh its probative value against its prejudicial impact." *Brown, supra,* 409 A.2d at 1097.

**15.** I note, though, that at least in my view, the evidence in this case "clearly linked" Huff to the crime even in the broadest sense of these words.

majority decision in this case can be reconciled with this court's approach to "clearly link" in *Freeland, Ford, Stack* and *Johnson.* The kind of issue presented here arises with some frequency. Consideration by the full court may therefore be appropriate.

I respectfully dissent.